**COLLEGE ENTRANCE EXAMINATION BOARD; Graduate Management Admissions Council, Inc.; Test of English as a Foreign Language Policy Council; and Educational Testing Service, Plaintiffs,**

**v.**

**George E. PATAKI, as Governor of the State of New York; Thomas Sobol, as Commissioner of Education of the State of New York; Regents of the University of the State of New York; Martin C. Barell, as Chancellor, Board of Regents of the University of the State of New York; R. Carlos Carballada, as Vice Chancellor, Board of Regents of the University of the State of New York; Jorge L. Batista, Shirley C. Brown, Laura Bradley Chodos, Walter Cooper, Willard A. Genrich, Norma Gluck, Emlyn I. Griffith, Carl T. Hayden, Mimi Levin Lieber, Floyd S. Linton, Gerald J. Lus-**

tig, Louise P. Matteoni, J. Edward Meyer and Adelaide L. Sanford, as Members of the Board of Regents of the University of the State of New York; and Dennis C. Vacco, as Attorney General of the State of New York, Defendants.[1]

No. 90–CV–437.

United States District Court, N.D. New York.

June 9, 1995.

---

1. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, George E. Pataki, as Governor of the State of New York, and Dennis C. Vacco, as Attorney General of the State of New York, have been substituted as parties to this action in place of their respective predecessors, Mario Cuomo and Robert Abrams. *See* Fed.R.Civ.P. 25(d).

Sullivan & Cromwell, New York City, James H. Carter, Lori S. Sherman, of counsel, for plaintiff College Entrance Examination Bd.

Wilmer, Cutler & Pickering, Washington, DC, Thomas P. Olson, Susan P. Crawford, of counsel, for plaintiffs Graduate Record Examinations Bd., Test of English as a Foreign Language Policy Council, and Educ. Testing Service.

Stanford von Mayrhauser, General Counsel, Educ. Testing Service, Princeton, NJ.

Perkins & Coie, Washington, DC, John M. Devaney, of counsel, for plaintiff Graduate Management Admissions Council, Inc.

Nixon, Hargrave, Devans & Doyle, Rochester, NY, Harold A. Kurland, of counsel, for plaintiffs.

Dennis C. Vacco, Atty. Gen. for the State of N.Y., Albany, NY, David B. Roberts, Asst. Atty. Gen., of counsel, for defendants.

## MEMORANDUM–DECISION AND ORDER

McCURN, Senior District Judge.

### INTRODUCTION

Plaintiffs College Entrance Examination Board ("CEEB"), Graduate Record Examinations Board ("GRE"), Test of English as a Foreign Language Policy Council ("TOEFL") and Educational Testing Service ("ETS") (referred to collectively as "the moving plaintiffs") move for a preliminary injunction enjoining defendants (collectively referred to as "the State") from enforcing New York Education Law §§ 341 and 342 ("Standardized Testing Act" or "STA") against them during the pendency of this litigation.[2]

---

**2.** Section 502 of the Copyright Act provides, in pertinent part, that a court may grant injunctive relief "[a]s it may deem reasonable to prevent or

As a basis for their motion, the moving plaintiffs contend that the STA conflicts with, and is therefore preempted by, the Federal Copyright Act of 1976. In addition, the moving plaintiffs assert that they are likely to succeed on the merits of their claim of copyright infringement and that they will suffer irreparable injury if the court does not grant them the preliminary relief they seek.[3]

## BACKGROUND [4]

The moving plaintiffs, together with GMAC, commenced this suit in 1990 seeking a declaration that sections 341 and 342 of the STA ("the disclosure provisions") as applied to them, *inter alia*, conflict with, and therefore are preempted by, the Federal Copyright Act of 1976.[5] In addition, plaintiffs sought a judgment permanently enjoining the State from enforcing sections 341 and 342 of the STA against them.

Upon commencing this action, the moving plaintiffs sought a preliminary injunction to enjoin enforcement of the STA against them. In support of that motion, the moving plain-

restrain infringement of a copyright." 17 U.S.C. § 502(a) (West 1977).

3. The Graduate Management Admissions Council ("GMAC") is also a plaintiff in this action but has not joined in this motion. This court denied similar relief to GMAC in 1992 based upon the court's finding that GMAC had failed to show either irreparable injury or a likelihood of success on the merits of its copyright infringement claim. *College Entrance Examination Board v. Cuomo*, 788 F.Supp. 134 (N.D.N.Y.1992). In that decision, the court also noted that GMAC's delay in seeking such relief further mitigated against the court's granting its request at that time. *Id.* at 145.

4. The facts which underlie this action are not in dispute. The procedural history of this case, the majority of which is set forth here, was previously addressed in this court's earlier decision in this matter. *See College Entrance Examination Board v. Cuomo*, 788 F.Supp. 134 (N.D.N.Y. 1992).

5. Section 341 of the STA provides:
1. Whenever any test agency prepares or causes to have prepared research which is used in any study, evaluation or statistical report pertaining to a test operational after January first, nineteen hundred eighty, such study, evaluation or report shall be filed with the commissioner. This section shall apply to any unpublished study, evaluation or statistical report cited in memoranda of support or opposition to legislation or proposed rules and regulations relating to standardized testing written or published by the test agency or its employees in behalf of the test agency on or after July first, nineteen hundred ninety-three.
2. If any reports or other documents submitted pursuant to this section contain information identifiable with any test subject or test user institution, such information shall be deleted prior to filing with the commissioner.
3. All reports or other documents submitted pursuant to this section shall be public records.
N.Y.Educ.Law § 341 (McKinney 1988 & Supp. 1995).

Section 342 provides, in pertinent part:
1. Within thirty days after the results of any standardized test are released, the test agency shall file or cause to be filed with the commissioner:
 a. a copy of all test questions used in calculating the test subject's raw score;
 b. the corresponding acceptable answers to those questions; and
 c. all rules for converting raw scores into those scores reported to the test subject together with an explanation of such rules.
2. Within ninety days after filing a standardized test pursuant to subdivision one of this section and for a period of not less than ninety days after the offer is made, the test agency shall provide to the test subject the opportunity to secure:
 a. a copy of the test questions used to calculate the test subject's raw score;
 b. a copy of the test subject's answer sheet, or answer record where there is no answer sheet, together with a copy of the correct answer sheet to the same test with questions used to calculate the test subject's raw score so marked; and
 c. a statement of the raw score used to calculate the scores reported to the test subject.
 The agency may charge a nominal fee for providing such information, not to exceed the direct cost thereof....
3. a. Notwithstanding subdivisions one and two of this section, a test agency may withhold from disclosure any test forms administered in New York in any given test program to not more than five percent of the anticipated test subjects annually or to not more than five thousand test subjects annually, whichever is less....
4. Within three years after the administration in New York of a standardized test form not required to be disclosed under subdivision three of this section the test agency shall file the test form and the corresponding acceptable answers with the commissioner....
7. Documents submitted to the commissioner pursuant to this section shall be public records and, in collecting this material, the State Education Department shall be considered an archive under Title 17 § 108 U.S.C. ...
N.Y.Educ.Law § 342 (McKinney 1988).

tiffs claimed that in the years between 1979 when the STA was enacted and 1990 they had curtailed the number of tests that they offered in New York while at the same time increasing the number of test dates nationwide because they did not want to subject additional tests to the STA's disclosure requirements. Moreover, the moving plaintiffs asserted that if the court granted their motion, they would increase the number of administrations of their tests in New York to national levels and would continue to disclose the same number of tests as they had in prior years.

Shortly before the present action was commenced, this court granted summary judgment to the plaintiff in *Association of Am. Medical Colleges v. Carey*, 728 F.Supp. 873 (N.D.N.Y.1990), *reversed, permanent injunction vacated and remanded,* 928 F.2d 519 (2d Cir.), *cert. denied,* 502 U.S. 862, 112 S.Ct. 184, 116 L.Ed.2d 146 (1991) (*"AAMC I"*), and permanently enjoined the State from enforcing sections 341 and 342 of the STA against it. At the time that the present action was commenced, an appeal was pending in *AAMC I.* In light of the status of that case, the State decided to enter into an agreement with regard to the temporary relief sought by the moving plaintiffs rather than risk the entry of a preliminary injunction. Thus, the motion for preliminary injunction was resolved by a stipulation in which it was agreed that during the 1990–1991 test year the moving plaintiffs would continue to disclose their tests in New York at the same rate as they had in the past. In addition, the moving plaintiffs would offer New York residents additional administrations of their tests with the understanding that these additional administrations would not be subject to the STA's disclosure requirements.[6]

The terms of the stipulation were to expire when all appellate proceedings were concluded in *AAMC I.* The Second Circuit reversed the judgment of this court, vacated the permanent injunction, and remanded the case for further proceedings on March 12, 1991. However, the court enjoined the State from enforcing the STA provisions against AAMC during the pendency of the remand proceedings. *Association of Am. Medical Colleges,* 928 F.2d 519, 526 (2d Cir.), *cert. denied,* 502 U.S. 862, 112 S.Ct. 184, 116 L.Ed.2d 146 (1991) (*"AAMC II"*). AAMC then applied for a writ of certiorari which the Supreme Court denied on October 7, 1991. Due to the fact that the appellate proceedings in *AAMC I* extended into the 1991–1992 test year, plaintiffs had a right, under the stipulation, to curtail the disclosure and filing of their test forms in that year. Only GMAC availed itself of that opportunity. While the moving plaintiffs continued to disclose tests at their historic rates, GMAC cut the number of disclosed tests in half, from four tests to two tests.

In November 1991, plaintiffs initiated discussions with the State to extend the stipulation regarding preliminary injunctive relief for a period of one more year. All of the plaintiffs, with the exception of GMAC, were willing to continue to disclose their tests at the same rates as they had done in the 1990–1991 test year. GMAC, on the other hand, was willing to disclose only two of the four tests that it would administer in the 1992–1993 test year. A stipulation extending the original compromise was executed by all of the plaintiffs except GMAC on December 24, 1991, and filed on January 21, 1992. GMAC then filed a motion for preliminary injunction on February 20, 1992.

Since GMAC sought exactly the same relief in its 1992 motion as the moving plaintiffs presently seek, it is important to understand

---

**6.** Although GMAC was not one of the moving parties, it signed the stipulation which, as applied to it, provided that "[p]laintiff Graduate Management Admissions Council, Inc. shall voluntarily comply with the filing and disclosure requirements set forth in Sections 341 and 342 of the New York Education Law for the 1990–1991 test year; ..." *See* Stipulation dated May 11, 1990, at 2.

It is interesting to note that, unlike GMAC, none of the other plaintiffs agreed to disclose all of their tests. For example, GRE agreed to administer five examinations in New York but to disclose only three of them (60%). ETS agreed to administer six or seven SAT examinations in New York but to disclose only four of them (approx. 80%). Finally, TOEFL agreed to administer twelve TOEFL examinations but to disclose only five of them (approx. 42%).

what this court did and did not decide in that instance. Like the moving plaintiffs, GMAC asserted that "[t]he only basis for finding that the disclosure requirements of the STA do not constitute infringement must be founded on the fair use doctrine provided for in section 107 of the Copyright Act." *See College Entrance Examination Board v. Cuomo*, 788 F.Supp. 134, 139 (N.D.N.Y.1992) (hereinafter referred to as *"GMAC Decision"*). Unlike the moving plaintiffs, however, GMAC rested its entire argument that the STA's disclosure requirements infringed upon its rights under the Copyright Act upon the fourth fair use factor. Although the court noted that it would discuss the other three factors, it concentrated its discussion, as GMAC had, on the fourth factor to determine whether or not GMAC had met its burden to demonstrate a likelihood of success on the merits of its copyright infringement claim. *See id.* at 140. After discussing each of the fair use factors, this court concluded that because "[f]actor one favors the State, factor two favors GMAC, and factors three and four favor neither party, ... GMAC has not demonstrated a likelihood of success on the merits of its copyright infringement claim." *Id.* at 143.

Although this conclusion precluded a grant of preliminary relief, the court, nonetheless, went on to discuss whether GMAC had demonstrated that it would suffer irreparable injury if such relief were not granted. In this regard, GMAC argued, *inter alia*, that because it had established a prima facie case of copyright infringement; i.e., that the STA's disclosure requirements did not constitute fair use, it was entitled to a preliminary injunction. The court rejected this contention, however, based upon its previous finding that GMAC had not shown a likelihood of success on the merits of its claim of copyright infringement. Therefore, the court held that GMAC had failed to demonstrate that it would suffer irreparable injury if this court failed to grant its motion. *Id.* at 144.

Finally, although not necessary to its decision, this court noted that there were other equitable considerations which mitigated against the court granting GMAC's motion for a preliminary injunction. In this regard, the court stated that "[d]elays in seeking preliminary injunction serve as a ground for denying such relief." *GMAC Decision*, 788 F.Supp. at 145. The court found that GMAC, as well as the other plaintiffs, had waited ten years before commencing a suit challenging the STA. *See id.* Moreover, once the suit had been filed, GMAC, by stipulation, voluntarily continued to comply with the disclosure requirements for an additional year and then agreed to disclose two of its four tests for another year before moving for preliminary relief. *See id.* In addition, the court found that GMAC's argument that it sought preliminary relief to protect future violations of its copyrights was the same argument it could have made at any time during the ten years that the STA had been in effect. *See id.* Therefore, the court determined that "any alleged harm that GMAC may suffer during the pendency of this action is identical to the harm, if any, that it has endured during the last 10 years each time it has disclosed a test form." *GMAC Decision*, 788 F.Supp. at 145. Accordingly, the court concluded that "GMAC has failed to demonstrate the need for the preliminary relief it now seeks." *Id.*

Since the court entered its decision in 1992, the moving plaintiffs have entered into additional stipulations with the State regarding both the total number of test administrations which they would offer in New York and the number of these test forms which they would disclose in compliance with the STA. The stipulations that were entered in 1992 and 1993 required the moving plaintiffs to continue to disclose test forms at the same levels as they had between 1980 and 1990 while they continued to offer additional, non-disclosed tests in New York on additional dates that had been previously unavailable in this state. *See* State's Memorandum of Law at 8.[7] In 1994, two of the moving plaintiffs sought a stipulation that would have reduced the number of disclosed test forms to levels that were less than the levels of disclosure to

---

7. For purposes of this motion, the court adopts the State's recitation of the procedural history of

this case since 1992.

which the parties had previously agreed. In this regard, GRE sought to reduce the number of disclosed test forms during the 1994–1995 test year from three to two. Similarly, ETS sought to reduce the number of disclosed test forms during the 1994–1995 test year from five to four. The State maintains that

> [b]ecause this constituted a retrenchment on the plaintiffs' part, and because the defendants had (and have) separation-of-powers concerns about entering stipulations that have the practical effect of amending a statute, the defendants last year insisted that the plaintiffs attempt to seek a legislative solution to their problem with New York's disclosure requirements.

*See id.* at 9.

Given the State's position, the moving plaintiffs did, in fact, seek a legislative solution to their problems with the STA. A bill was passed by the State Senate at the end of the legislative session in June 1994 which would have provided the moving plaintiffs with the relief they sought with respect to the 1994–1995 test year. The proposed amendment provided, in pertinent part, that in the test year beginning July 1, 1994, the College Board would offer four disclosed administrations of the SAT, the Graduate Record Examinations Board would offer two disclosed administrations of the GRE, and the Test of English as a Foreign Language Policy Council would offer five disclosed administrations of the TOEFL. Unfortunately, given the timing, it was obvious that the State Assembly would not be able to address this amendment before the end of the legislative session. Therefore, the State reluctantly entered into stipulations that permitted the moving plaintiffs to reduce their levels of disclosure in the 1994–1995 test year.[8] These stipulations will expire on June 30, 1995.

For the test year 1995–1996, the College Board and the Graduate Record Examinations Board seek to retrench their levels of disclosure even further. In this regard, the College Board seeks to reduce its level of compliance with the STA to three disclosed tests in 1995–1996, four disclosed tests in 1996–1997, and, if feasible, five disclosed tests in 1997–1998. In addition, in the 1995–1996 test year, the College Board would like to offer five nondisclosed administrations of the SAT in New York. *See* Plaintiffs' Memorandum of Law at 9 (citing Dietrich Declaration at ¶ 29). The Graduate Record Examinations Board seeks to reduce its level of compliance to only two disclosed tests in 1995–1996, one disclosed test in 1996–1997, and, an as yet unspecified number thereafter. The Test of English as a Foreign Language Policy Council seeks only to preserve the status quo; i.e., it seeks to maintain the same level of disclosure that it offered between 1980 and 1994 (five tests) while making seven additional nondisclosed test dates available in New York.

The moving plaintiffs contend that "[b]ecause the State has declined to extend the stipulation for upcoming years, plaintiffs have been forced to file this motion to protect their rights and those of New York test-takers." *See* Plaintiffs' Memorandum of Law at 8. To the contrary, the State asserts that

> [i]t is the plaintiffs' effort to back away from their historic levels of successful compliance with New York's disclosure law, which they maintained between 1980 and 1993 without apparent harm to the validity or reliability of their test instruments, that has made it necessary for them to file this motion. They do not want to "extend" the stipulation; they want an injunction that fundamentally alters it.

*See* State's Memorandum of Law at 11.

Whatever the reason, the moving plaintiffs have moved for a preliminary injunction enjoining the State from enforcing sections 341 and 342 of the STA against them during the pendency of this litigation.[9]

**8.** Pursuant to the 1994–1995 Stipulation, the College Board agreed to disclose voluntarily four SAT test forms, the Graduate Record Examinations Board agreed to disclose voluntarily at least two test forms, and the Test of English as a Foreign Language Policy Council agreed to disclose at least five test forms. *See* 1994–1995 Stipulations attached as Exhibits to Plaintiffs' Motion for Preliminary Injunction.

**9.** The court heard oral argument in support of, and in opposition to, this motion on June 6, 1995. At that time, the court ruled from the

## DISCUSSION

### I. Preliminary Injunction Standard

 It is a well-settled rule that "[a] preliminary injunction is an extraordinary remedy that should be granted only upon a clear showing that there is a likelihood of success on the merits and irreparable injury." *GMAC Decision,* 788 F.Supp. at 138. Under ordinary circumstances, to obtain a preliminary injunction in this circuit, a plaintiff must demonstrate "(1) *either* a likelihood that [it] will succeed on the merits of [its] claim, *or* that the merits present serious questions for litigation and the balance of hardships tips decidedly toward the plaintiff; and (2) that without the injunction, [it] will likely suffer irreparable harm before the court can rule upon [its] claim." *Fisher–Price, Inc. v. Well–Made Toy Mfg. Corp,* 25 F.3d 119, 122 (2d Cir.1994) (citations omitted) (emphasis in original). Despite this general rule, however, " 'where the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not grant the injunction unless the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim.' " *GMAC Decision,* 788 F.Supp. at 139 (quoting *Plaza Health Lab., Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir.1989)). Accordingly, the court concludes that the moving plaintiffs are entitled to injunctive relief only if they are able to demonstrate irreparable injury and a likelihood of success on the merits.[10]

### II. Preemption Issue

The moving plaintiffs assert that the STA, as applied to them, is preempted by the Copyright Act. In this regard, they argue that the STA's disclosure provisions infringe upon their rights under the Copyright Act because they do not constitute "fair use" as defined by § 107 of that Act. Both the moving plaintiffs and the State spend most of their time addressing the four factors which courts must consider in determining whether a particular use of copyrighted material is a fair use. They do, however, briefly speak to the preliminary issue of whether the STA is, in fact, preempted by the Copyright Act.

 The moving plaintiffs argue that the STA is preempted by the Copyright Act on two grounds. First of all, they assert that the STA " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' as set forth in the Copyright Act." *See* Plaintiffs' Memorandum of Law at 12 (quoting *Jones v. Rath Packing Co.,* 430 U.S. 519, 526, 97 S.Ct. 1305, 1310, 51 L.Ed.2d 604 (1977)) (other citation omitted). Alternatively, they argue that "the Copyright Act creates a comprehensive statute that occupies the field with no room left over for state regulation." *See id.* at 12–13 (citing *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)) (footnote omitted). In contrast, the State contends that the STA is not preempted by the Copyright Act because "[t]he Act is not intended to, and does not, grant rights similar to the exclusive rights

---

bench on some issues and reserved decision with respect to others. The following constitutes the court's findings of fact and conclusions of law with respect to all issues necessary to the court's determination of this motion.

10. In their reply memorandum, the moving plaintiffs assert that because "[d]efendants do not have an exclusive claim on the public interest," the "sufficiently serious questions going to the merits" test is available to them. *See* Plaintiffs' Reply Memorandum of Law at 25. The moving plaintiffs rely, at least in part, upon *Haitian Ctrs. Council, Inc. v. McNary,* 969 F.2d 1326 (2d Cir.1992), *vacated as moot on other grounds,* —— U.S. ——, 113 S.Ct. 3028, 125 L.Ed.2d 716 (1993), to support their position. Although agreeing with this proposition under the circumstances of the case before it, the Sec-

ond Circuit distinguished *McNary* from *Medical Soc'y of the State of New York v. Toia,* 560 F.2d 535 (2d Cir.1977), and *Union Carbide Agric. Prod. Co., Inc. v. Costle,* 632 F.2d 1014 (2d Cir.1980), *cert. denied,* 450 U.S. 996, 101 S.Ct. 1698, 68 L.Ed.2d 196 (1981). In doing so, the court stated that "[i]n both *Medical Soc'y* and *Union Carbide,* **private litigants** sought to enjoin a **government agency** from taking action in the **public interest authorized by a specific statute.**" *McNary,* 969 F.2d at 1339 (emphasis added) (citations omitted). The instant case presents exactly the same scenario as those at issue in *Medical Soc'y* and *Union Carbide.* Thus, *McNary* supports this court's conclusion that the moving plaintiffs must demonstrate a likelihood of success on the merits, in addition to irreparable harm, to be entitled to a preliminary injunction.

granted to copyright owners under the Copyright Act, nor does it authorize others to diminish rights of copyright owners."[11] *See* State's Memorandum of Law at 34. Instead, the State asserts that the STA "[i]s intended to assure that certain standardized tests given in New York, which happen to be copyrighted, are fair to those who take them, and that their validity is open to public scrutiny."[12] *See id.*

As this court stated in *AAMC I*, "[t]he central legal question presented is whether the disclosure requirements of New York's Standardized Testing Act clash with rights conferred upon plaintiff by the Federal Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*, in a manner which compels this court to find the State Act invalid by virtue of the Supremacy Clause of the U.S. Constitution." *Id.* at 874 (quoted in *AAMC II*, 928 F.2d at

522). In reviewing this issue, the Second Circuit explained that the Supremacy Clause may compel invalidation of state law in several ways:

> "First, Congress may in express terms declare its intention to preclude state regulation in a given area.... Second, in the absence of an express declaration, preemption may be implied when the federal law is 'sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementing state regulation.' ... Finally, state law may be preempted 'to the extent that it actually conflicts with a valid federal statute.'"

*AAMC II*, 928 F.2d at 522 (quoting *Darling v. Mobil Oil Corp.*, 864 F.2d 981, 985–86 (2d Cir.1989) (citations omitted)).

---

**11.** The gravamen of the State's argument with respect to the preemption issue is based upon Judge Mahoney's opinion, concurring in part and dissenting in part, in *AAMC II*. In that opinion, Judge Mahoney noted that he "[g]enerally agree[d] with [his] colleagues' conclusion that summary judgment was improper because there existed genuine issues of material fact regarding New York State's fair use defense." *AAMC II*, 928 F.2d at 526. Nonetheless, he wrote separately "[t]o express [his] doubt concerning a more fundamental aspect of the district court's opinion, the recognition of a preemption-like conflict between the STA and the Copyright Act." *Id.* In this regard, he noted that his colleagues, in apparent agreement with the district court's analysis on this issue, had concluded that " 'If the STA facilitates infringement, it conflicts with the federal Copyright Act and is preempted' (subject, of course, to defenses, such as fair use, provided by the Copyright Act itself)." *Id.* at 526–27. Judge Mahoney went on to explain that, unlike his colleagues, he would not find a fatal conflict so easily. In this regard, he stated that "[i]t seems to me that New York may require that the author of such an examination surrender a limited amount of his copyright protection in exchange for the privilege of administering the examination within the state." *Id.* at 527. Furthermore, Judge Mahoney explained that

> I would rule that a limited degree of interference with copyright privileges is permissible where a state, for purposes wholly unrelated to the policies that underly [sic] the protection of intellectual property, endeavors to regulate the manner in which an author markets his expression. Here, the chosen means of marketing the MCAT results in a secretive method of ranking medical school applicants. The State's policy is

directed at that marketing strategy, and any interference with copyrights is incidental....

> In sum, I cannot agree that a preemptive conflict between the Copyright Act and the STA results if the STA is deemed to "facilitate" copyright infringement, subject only to the defenses accorded by the Copyright Act. Rather, I would direct the district court to address the threshold preemption question on remand in accordance with the principles and authorities set forth hereinabove.

*Id.* at 527–28.

As the State implicitly recognizes, Judge Mahoney's opinion has no precedential value. Moreover, the State has presented the court with no reason to depart from the majority's reasoning in *AAMC II* upon which the court based its conclusion that if the STA facilitated infringement it would conflict with, and therefore be preempted by, the Copyright Act, subject to the defenses provided by the Act itself.

**12.** Alternatively, the State argues that the STA is not preempted by § 301 of the Copyright Act because § 301 preemption is limited to state laws that accord copyright-like protection to works of authorship. *See* State's Memorandum of Law at 35. It appears that the State offers this argument in response to footnote 17 of the moving plaintiffs' memorandum of law. *See* Plaintiffs' Memorandum of Law at 13 n. 17. In that footnote, the moving plaintiffs note that "[s]ection 301(a) may not be squarely applicable to the instant suit because the [STA] *destroys*, rather than *creates* exclusive rights." *See id.* (emphasis in original). Given the fact that the moving plaintiffs do not rely upon § 301 to support their argument that the STA is preempted by the Copyright Act, the court sees no reason to engage in a

The court went on to explain that "conflict preemption" occurs either when " ' "compliance with both federal and state regulations is a physical impossibility," . . . or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress." ' " *Id.* at 522–23 (quoting *Darling v. Mobil Oil Corp.,* 864 F.2d at 986 (citations omitted)).

In the present case, the moving plaintiffs argue that by forcing them to publish copyrighted secure tests, the STA alters the balance struck by Congress between the exclusive rights of copyright owners found in § 106 of the Copyright Act and the exceptions to those exclusive rights found in §§ 107–118 of the same Act. *See* Plaintiffs' Memorandum of Law at 13. Thus, the moving plaintiffs assert that "[u]nless the forced publication compelled by the [STA] fits within an exception created by Congress—the fair use doctrine—the [STA] is necessarily at war with, and preempted by, the Copyright Act." *See id.* at 14.

The court agrees. There is no dispute that the materials at issue here are within the subject matter of the Copyright Act. Nor is there any dispute that the moving plaintiffs own 'valid copyrights to these materials. Therefore, barring a statutory exception, § 106 of the Copyright Act confers upon the moving plaintiffs

[t]he exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending; . . .

17 U.S.C. § 106 (West 1977 & Supp.1995).

Given the broad disclosure requirements of the STA, the court is left with the inescapable conclusion that the STA interferes with the moving plaintiffs' exclusive ownership rights as set forth in § 106 of the Copyright Act. It does so, for example, by requiring these plaintiffs to disclose their test forms and the individual test questions which, for various reasons, they wish not to disclose. In addition, the STA classifies these disclosed materials as public records and, thereby, subjects them to disclosure to, and reproduction by, the public. Under these circumstances, the court holds, as it has previously, that unless the STA's disclosure requirements constitute fair use, the STA directly conflicts with, and is therefore preempted by, the Copyright Act.[13] *See, generally AAMC I.*[14]

### III. Likelihood of Success on the Merits— Fair Use Doctrine [15]

 Fair use is an affirmative defense and, as such, the burden of proving fair use

discussion of the applicability of this section to the case at hand.

13. Since the court finds that the STA is preempted by the Copyright Act unless its disclosure requirements constitute fair use, it sees no need to address the moving plaintiffs' alternative argument in favor of preemption.

14. The court notes that although the Second Circuit reversed this court's grant of summary judgment to the plaintiff in *AAMC I,* it did not disturb this court's finding that the STA conflicted with the Copyright Act unless it constituted a fair use of the copyrighted materials. In this regard, the court noted that

"Our task is 'to determine whether, under the circumstances of this particular case, [the State's] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Jones v. Rath Packing Co.,* 430 U.S. 519, 526, 97 S.Ct. 1305, 1310, 51 L.Ed.2d 604 (1977) (citation

omitted). Thus, we must determine whether the disclosure of the MCAT facilitated by the STA infringes on the copyrights held by AAMC. If the STA facilitates infringement, it conflicts with the federal Copyright Act and is preempted. Such a determination is made in light of the "fair use" defense since "[t]he existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute." *Rice v. Norman Williams Co.,* 458 U.S. 654, 659, 102 S.Ct. 3294, 3299, 73 L.Ed.2d 1042 (1982).
*AAMC II,* 928 F.2d at 523.

15. The fair use doctrine is codified at 17 U.S.C. § 107. This statute provides that

Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multi-

is always on the party asserting the defense, regardless of the type of relief sought by the copyright owner. *Campbell v. Acuff–Rose Music, Inc.*, —— U.S. ——, ——, and n. 20, 114 S.Ct. 1164, 1177 and n. 20, 127 L.Ed.2d 500, 522 and n. 20 (1994) (citing *Harper & Row*, 471 U.S., at 561, 105 S.Ct. at 2230; H.R.Rep. No. 102–836, p. 3, n. 3 (1992)); *see also American Geophysical Union v. Texaco Inc.*, 37 F.3d 881 (2d Cir.1994).[16] Of course, as an affirmative defense, the issue of fair use is not relevant until the copyright owner has established a prima facie case of infringement. *See* H.R.Rep. No. 102–836 p. 3. To make out such a case, a copyright owner must demonstrate ownership of the right asserted and unauthorized appropriation by the defendant of a material amount of the expression. *See id.; see also Association of Am. Medical Colleges v. Mikaelian*, 571 F.Supp. 144, 149 (E.D.Pa.1983), *aff'd without opinion*, 734 F.2d 3 (3d Cir.1984) ("*Mikaelian* ").

◼ Given the case law addressing the copyrightability of materials such as those at issue here, there can be no dispute that the SAT I, GRE, and TOEFL forms and questions are protected by the Copyright Act. *See* 17 U.S.C. § 102(a) (West 1995 Supp.); *see, e.g. AAMC II*, 928 F.2d at 521; *Educational Testing Serv. v. Katzman*, 793 F.2d 533, 538–39 (3d Cir.1986). In addition, it is uncontroverted that the moving plaintiffs regularly register their test forms with the United States Copyright Office. *See* Plaintiffs' Memorandum of Law at 5 and n. 7. Finally, there can be no dispute that the STA

requires the moving plaintiffs to distribute to the commissioner, and through him the general public, copies of their secure test forms and the questions contained therein. Given these circumstances, the court concludes that the moving plaintiffs have established a prima facie case of copyright infringement. Accordingly, the burden now shifts to the State to demonstrate that its use of these materials constitutes a fair use within the meaning of the Copyright Act.

Until the 1976 amendments to the Copyright Act, fair use was a judge-made doctrine. In that year, Congress added § 107 to the Copyright Act which codified this doctrine. As the Supreme Court noted in *Campbell*, "Congress meant § 107 'to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way' and intended that courts continue the common law tradition of fair use adjudication." *Campbell*, —— U.S. at ——, 114 S.Ct. at 1170, 127 L.Ed.2d at 514 (quoting H.R.Rep. No. 94–1476, p. 66 (1976); S.Rep. No. 94–473, p. 62 (1975) U.S.Code Cong. & Admin.News 1976, pp. 5659, 5679). The Court went on to explain that "[t]he fair use doctrine thus 'permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.' " *Id.* (quoting *Stewart v. Abend*, 495 U.S. 207, 236, 110 S.Ct. 1750, 1767, 109 L.Ed.2d 184 (1990) (internal quotation marks and citation omitted)).

◼ "Fair use is a mixed question of law and fact." *Harper & Row, Publishers v.*

---

ple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

 (1) the purpose and character of use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

 (2) the nature of the copyrighted work;

 (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

 (4) the effect of the use upon the potential market for or value of the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors. 17 U.S.C. § 107 (West Supp.1995).

**16.** The court notes that H.R.Rep. No. 102–836 p. 3, n. 3, U.S.Code Cong. & Admin.News 1992, 2553, 2555, n. 3, cited in *Campbell*, provides that

 [i]n *College Entrance Examination Board v. Cuomo*, 90–CV–437 (N.D.N.Y. filed March 23, 1992), slip opinion at p. 11 footnote 7, the district court erroneously held that where the copyright owner seeks a preliminary injunction the copyright owner bears the burden of disproving the defense.... The *College Entrance Examination Board* opinion is contrary to the statute and the Supreme Court's *Harper & Row* opinion: the burden of proving fair use is always on the party asserting the defense, regardless of the type of relief sought by the copyright owner.

H.R.Rep. No. 102–836 p. 3, n. 3, U.S.Code Cong. & Admin.News 1992, p. 2555, n. 3.

*Nation Enters.,* 471 U.S. 539, 560, 105 S.Ct. 2218, 2230, 85 L.Ed.2d 588, 607 (1985) (citing *Pacific & Southern Co. v. Duncan,* 744 F.2d 1490, 1495, n. 8 (11th Cir.1984)). In determining whether a particular use of copyrighted material is fair, a court must consider the four non-exclusive factors enumerated in § 107. *See Harper & Row,* 471 U.S. at 560, 105 S.Ct. at 2230, 85 L.Ed.2d at 607; *American Geophysical Union,* 37 F.3d at 886; *Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.,* 996 F.2d 1366, 1373 (2d Cir.1993). In doing so, however, the court must keep in mind that " '[s]ince the doctrine is an equitable rule of reason, no generally applicable definition is possible, and each case raising the question must be decided on its own facts.' " *Harper & Row,* 471 U.S. at 560, 105 S.Ct. at 2230, 85 L.Ed.2d at 607 (quoting House Report, at 65, U.S.Code Cong. & Admin.News 1976, p. 5678). Therefore, in order to determine whether the State has met its burden, the court will review the evidence pertaining to each of the four factors enumerated in § 107 as well as any equitable considerations which may be relevant to such a determination.[17]

### A. Purpose and Character of the Use

■ The first factor in the fair use analysis is "[t]he purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). As the Supreme Court explained in *Campbell,* "[t]his factor draws on Justice Story's formulation, 'the nature and objects of the selections made.' " *Campbell,* — U.S. at —, 114 S.Ct. at 1171, 127 L.Ed.2d at 515 (quoting *Folsom v. Marsh,* 9 F.Cas., at 348). The Court went on to explain that

> [t]he central purpose of this investigation is to see, in Justice Story's words, whether the new work merely "supersede[s] the objects" of the original creation, *Folsom v. Marsh, supra,* at 348; *accord Harper & Row, supra,* 471 U.S., at 562, 105 S.Ct., at

2231 ("supplanting" the original), or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is "transformative." Leval 1111.

*Campbell,* — U.S. at —, 114 S.Ct. at 1171, 127 L.Ed.2d at 515.

Although the Court noted that such transformative use is not absolutely necessary for a finding of fair use, the goal of the Copyright Act to promote science and the arts generally is furthered by the creation of such works. *See id.* Moreover, the Court stated that the more transformative the work, the less significant the other factors may weigh against a finding of fair use. *See id.*

With respect to the "noncommercial/commercial" aspect of this factor, the *Campbell* Court noted that this is only one element of the court's inquiry into the purpose and effect of the copyrighted work. *See Campbell,* — U.S. at —, 114 S.Ct. at 1174, 127 L.Ed.2d at 518. In this regard, the Court explained that "Section 107(1) uses the term 'including' to begin the dependent clause referring to commercial use, and the main clause speaks of a broader investigation into 'purpose and character.' " *Id.* . Moreover, the Court reiterated that "[a]s we explained in *Harper & Row,* Congress resisted attempts to narrow the ambit of this traditional enquiry by adopting categories of presumptively fair use, and it urged courts to preserve the breadth of their traditionally ample view of the universe of relevant evidence." *Id.* (citing 471 U.S. at 561, 105 S.Ct. at 2230; House Report, p. 66, U.S.Code Cong. & Admin.News 1976, pp. 5659, 5679). Based upon this interpretation of the noncommercial/commercial dichotomy, the Court concluded that "[t]he mere fact that a use is educational and not for profit does not insulate it from a finding of infringement[.]" *Id.*

---

17. Although the four factors enumerated in § 107 are considered to be non-exclusive, thus leaving the court free to address other factors that it believes to be relevant under the circumstances of a particular case, one often-quoted commentator has advised against such an approach. *See* Pierre N. Leval, *Toward A Fair Use Standard,* 103 Harv.L.Rev. 1105, 1125 (1990) ("Additional considerations that I and others have looked to are false factors that divert the inquiry from the goals of copyright.").

Since the Supreme Court's decision in *Campbell,* the Second Circuit has had the opportunity to address both the "purpose" and the "character" elements of this first factor. *See Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.,* 996 F.2d 1366 (2d Cir. 1993). In *Twin Peaks* the court was called upon to determine whether a book of comment and criticism which summarized in great detail the plots of eight episodes of the television series, Twin Peaks, constituted fair use. *See id.* at 1374. With respect to the "purpose" element of this factor, the court noted that

> "[p]urpose" in fair use analysis is not an all-or-nothing matter. The issue is not simply whether a challenged work serves one of the non-exclusive purposes identified in section 107, [such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research], but whether it does so to an insignificant or a substantial extent.

*Twin Peaks,* 996 F.2d at 1374.

Turning to the "character" element, the court focused upon the transformative nature of the allegedly infringing use. For example, the court explained that such a transformative use would occur "[i]f a plot was briefly described for purposes of adding significant criticism or comment about the author's plotting technique." *Id.*

Applying both of these elements to the particular facts of the case before it, the court found, first of all, that the defendants' "[d]etailed report of the plots goes far beyond merely identifying their basic outline for the transformative purposes of comment or criticism." *Id.* Furthermore, the court concluded that "where, ..., the [infringing use] serves no transformative function and elaborates in detail far beyond what is required to serve any legitimate purpose, the first factor cannot be weighted in favor of the fair use defense." *Id.* at 1376.

In the present case, the State argues that this factor weighs in its favor because the uses of the moving plaintiffs' copyrighted materials contemplated by the STA are "[p]lainly 'non-profit educational purposes' expressly protected by section 107(1) that serve important public interests." [18] *See* State's Memorandum of Law at 22. The State explains that "[its] uses ... serves [sic] the public's interests in ensuring the fairness and objectivity of standardized school admissions tests, evaluating the accuracy of the scoring process, eliminating potential bias, and opening up a process that has a major impact on the lives and careers of students in New York." *See id.* In addition, the State asserts that its use of the moving plaintiffs' materials "serve[s] the test-taking public by making past administrations of standardized admissions tests available for study to future test takers, neutralizing the advantage historically available only to those students affluent enough to pay for commercial coaching courses." *See id.*

In response, the moving plaintiffs argue that given the recent developments in the law of fair use and the facts underlying the present dispute, the first factor favors them. *See* Plaintiffs' Memorandum of Law at 18. In support of this position, they assert, *inter alia,* that the STA "[c]ommands simple xerographic duplication—precisely the type of *non*-transformative use that is disfavored in a fair use analysis." *See id.* at 19 (citing

---

18. The State cites the Second Circuit's decision in *AAMC II,* 928 F.2d at 524, and this court's *previous decision in this case denying GMAC's* motion for a preliminary injunction, *GMAC Decision,* 788 F.Supp. at 140–41, in support of its contention that this factor weighs in its favor. *See* State's Memorandum of Law at 21–22. The State is correct that in both of those instances, the courts concluded that the first factor favored the State. The court notes, however, that the context in which those courts reached their decisions is distinguishable from that present here. First of all, in *AAMC II,* after noting that this

court had concluded that the first factor favored the State, the Second Circuit went on to explain that "[t]his conclusion is essentially uncontested by the parties, and we find no reason to disturb it." *AAMC II,* 928 F.2d at 524. Likewise, in holding that this factor favored the State, this court noted that "GMAC appears to concede that this factor weighs in favor of the State." *See GMAC Decision,* 788 F.Supp. at 141. Unlike the plaintiffs in those two instances, the moving plaintiffs do not concede that this factor favors the State. To the contrary, they vigorously assert that this factor weighs in their favor.

*American Geophysical Union,* 37 F.3d at 891).[19]

The respective arguments of the parties demonstrate the tension inherent in the "purpose" and "character" elements of the first fair use factor. There is no doubt that the STA serves a non-commercial use with laudable purposes. On the other hand, it is equally beyond dispute that the character of the STA's disclosure requirements constitutes a non-transformative use of the moving plaintiffs' copyrighted materials. If this were a case in which the State's purpose were commercial and the character of that use were non-transformative, undoubtedly the court would conclude that this factor weighed in favor of the moving plaintiffs. Conversely, if the State's purposes were non-commercial and the character of the use were even minimally transformative, the court would tend to conclude that this factor should be weighed in favor of the State. What the court is faced with, however, is the situation in which the "purpose" of the use weighs in favor of the State while the "character" of the use weighs in favor of the moving plaintiffs. Under such circumstances, the court must conclude that this factor favors neither party.

### B. Nature of the Copyrighted Work

The second fair use factor concerns "the nature of the copyrighted work." 17 U.S.C. § 107(2). As the Supreme Court stated in *Campbell,* "[t]his factor calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell,* —— U.S. at ——, 114 S.Ct. at 1175, 127 L.Ed.2d at 520 (citations omitted). In other words, the manifestly factual nature of a particular copyrighted work may preclude the same from being considered " 'within the core of the copyright's protective purposes.' " *See American Geophysical Union,* 37 F.3d at 893 (quoting *Campbell,* —— U.S. at ——, 114 S.Ct. at 1175; citing *Harper & Row,* 471 U.S. at 563, 105 S.Ct. at 2232 ("The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy.")).

This general rule, however, yields to some extent when the work in question is unpublished. In such cases, "[t]he scope of fair use is narrower ..." *Harper & Row,* 471 U.S. at 564, 105 S.Ct. at 2232, 85 L.Ed.2d at 609. This is because "[t]he author's right to control the first public appearance of this expression weighs against such use of the work before its release. The right of first publication encompasses not only the choice whether to publish at all, but also the choices of when, where, and in what form first to publish a work." *Id.*

In the present case, the State concedes that the court previously rejected its contention that "[t]he public disclosure of plaintiffs' tests when they are administered brings them sufficiently into the public domain that they should be regarded as published works." *See* State's Memorandum of Law at 23 (citing *College Board,* 788 F.Supp. at 141). Despite this concession, however, the State offers the same argument in order to preserve the record. *See id.* In addition, the State contends that "[b]ecause the plaintiffs' tests are by definition a factual work, the right to their fair use is greater." *See id.* at 24–25.

To the contrary, the moving plaintiffs assert that "[a]ll other courts that have considered the matter have concluded that the second fair use factor, ..., favors the plaintiff in a lawsuit over infringement of secure

---

19. In further support of their position, the moving plaintiffs assert that

 [1] [w]hatever the nominal goals of the [STA], the actual impact here of the State's demand for involuntary publication is to force the plaintiffs to withdraw test administrations from this State and inconvenience test-takers[;]

 ...

 [2] to the extent the State wishes to open up the testing process to comment and criticism, each of the plaintiffs has already disclosed dozens of its test forms to public scrutiny, and will continue to provide substantial disclosure in the future[;] ... [and]

 [3] even accepting that there is a public interest in disclosure, there is a strong countervailing public interest in ensuring the fairness and validity of admissions tests [which] [t]he State's demand for mandatory disclosure of all administered test forms would place ... at grave risk.

*See* Plaintiffs' Memorandum of Law at 18–19 (citations omitted).

tests." *See* Plaintiffs' Memorandum of Law at 20 (citing *AAMC,* 928 F.2d at 524 (MCAT); *GMAC Decision,* 788 F.Supp. at 141 (GMAT); *Educational Testing Services v. Katzman,* 793 F.2d 533, 543 (3d Cir.1986) (SAT) (*"Katzman"*); *Mikaelian,* 571 F.Supp. at 153 (MCAT)). Moreover, they contend that "Congress echoed and confirmed these views in enacting the 1992 amendments to the fair use provision of the Copyright Act. *See id.* at 21 (citing S.Rep. No. 141, 102d Cong., 1st Sess. 6 (1991) (amendment "not intended to reduce the protection of secure tests, the utility of which is especially vulnerable to unauthorized disclosure"); 137 Cong. Rec. S13923 (daily ed. Sept. 27, 1991) (amendment not intended to "weaken the very strong protection that the courts have given to an important type of copyrighted work—secure tests such as the [ACT,] SAT, LSAT, and MCAT.")).

The court need not spend much time discussing this factor. With respect to the State's first argument that the moving plaintiffs' tests should be considered published, the court disagrees for the same reasons cited in its previous decision in this matter. To reiterate, "[w]hen 37 C.F.R. section 202.20's definition of a secured [sic] test is read in conjunction with 17 U.S.C. section 101's definition of publication, there is only one conclusion—as long as the test remains secure, it is unpublished." *GMAC Decision,* 788 F.Supp. at 141; *see also National Conference of Bar Examiners v. Multistate Legal Studies, Inc.,* 692 F.2d 478, 486 n. 8 (7th Cir.1982), *cert. denied,* 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983) ("We agree with the Register of Copyrights that the [Multistate Bar Examination] would probably be classified as an unpublished work under 17 U.S.C. § 101 ...") (quoted in *AAMC II,* 928 F.2d at 524).[20]

With respect to the State's second argument, the court agrees that, by their very nature, the questions contained in each of the copyrighted documents test the subject's knowledge of factual material. However, this conclusion does not negate a finding that the development of the test questions as well as their compilation in a particular test form is a " 'creative, imaginative, and original' " process. *AAMC II,* 928 F.2d at 524 (quoting *MCA, Inc. v. Wilson,* 677 F.2d 180, 182 (2d Cir.1981)); *see also Mikaelian,* 571 F.Supp. at 150, 153. Given the secure nature of these materials, the creativity involved in their development and compilation, and the special consideration normally afforded unpublished works, the court concludes that this factor weighs heavily in favor of the moving plaintiffs.

### C. Amount and Substantiality of the Portion Used

The third fair use factor concerns "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). As the Supreme Court explained in *Campbell,* this factor asks the question whether " 'the quantity and value of the materials used,' *Folsom v. Marsh, supra,* at 348) are reasonable in relation to the purpose of the copying." *Campbell,* —— U.S. at ——, 114 S.Ct. at 1175, 127 L.Ed.2d at 520. In other words, "[a]ttention turns to the persuasiveness of [an infringer's] justification for the particular copying done, and the enquiry will harken back to the first of the statutory factors, for, as in prior cases, we recognize that the extent of permissible copying varies with the purpose and character of the use." *Id.* (citations omitted). However, in situations in which entire works have been copied, the Second Circuit has concluded that although such a finding "[d]oes not preclude a finding of fair use, it militates against such a finding, *see Sony,* 464 U.S. at 449–50, 104 S.Ct. at 792, and weights the third factor in favor of the [copyright holder]." *American Geophysical Union,* 37 F.3d at 894; *see also Weissmann v.*

---

**20.** Pursuant to 37 C.F.R. § 202.20(b)(4),

[a] *secure test* is a nonmarketed test administered under supervision at specified centers on specific dates, all copies of which are accounted for and either destroyed or returned to restricted locked storage following each administration. For these purposes a test is not marketed if copies are not sold but it is distributed and used in such a manner that ownership and control of copies remain with the test sponsor or publisher.

37 C.F.R. § 202.20(b)(4) (1994) (emphasis in original).

*Freeman,* 868 F.2d 1313, 1325 (2d Cir.1989) ("whatever the use, generally it may not constitute a fair use if the entire work is reproduced" (citation omitted)).

In the present case, the State concedes that the STA requires the filing of a copy of all test questions used in calculating the test taker's raw score. *See* State's Memorandum of Law at 25 (citing N.Y.Educ.Law § 342(1)(a)). Nevertheless, it argues that it is improper to apply the third fair use factor mechanically to this scenario. *See id.* (citing *College Board,* 788 F.Supp. at 141–42). In this regard, the State asserts that in situations like the present one in which the copying of a protected work is undertaken for a different functional purpose than that of the copyright owner, the fair use doctrine will protect the virtual total reproduction of the copyrighted work. *See id.* at 25–26 (citing *Sony,* 464 U.S. at 449–50, 104 S.Ct. at 791; *Update Art, Inc. v. Maariv Israel Newspaper, Inc.,* 635 F.Supp. 228, 231 (S.D.N.Y. 1986) quoting Nimmer § 13.05[D] ).

To the contrary, the moving plaintiffs assert that the State's contention that the "[m]andated copying of entire works d[oes] not tilt the third factor in favor of plaintiff[s] because the State's use of test forms is 'functionally different' from plaintiffs ... cannot be reconciled with the Copyright Act." *See* Plaintiffs' Memorandum of Law at 22. Rather, they argue that "[w]hen an *entire* work is copied, the third factor must necessarily favor the plaintiff—even though that finding may not, by itself, completely resolve the overall issue of fair use." *See id.* at 23 (emphasis in original).

▪ Although the State is correct that in **very** limited circumstances, the total reproduction of a copyrighted work does not mitigate against a finding of fair use, this is not one of those situations. In *Sony,* the case upon which the State relies to support its position, the Supreme Court found that

> [w]hen one considers the nature of a televised copyrighted audiovisual work, *see* 17 U.S.C. § 107(2) (1982 ed.), and that timeshifting merely enables a viewer to see such a work **which he had been invited to witness in its entirety free of charge,** the fact that the entire work is reproduced, *see*

§ 107(3), does not have its ordinary effect of militating against a finding of fair use.

*Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 449–50, 104 S.Ct. 774, 792, 78 L.Ed.2d 574, 597 (1984) (emphasis added).

Although *Sony* can be, and has been, read to stand for the proposition that copying of an entire work does not preclude a finding of fair use per se, courts have not interpreted *Sony* to alter the rule that copying of all, or substantially all, of a work weighs against a finding of fair use, even when such use is functionally different. For example, in addressing an argument similar to the State's, the Second Circuit stated:

> Nor does *Sony Corp. of America,* 464 U.S. at 449–50, 104 S.Ct. at 792–93, bear the weight that appellants place on it for the proposition that even 100 percent copying does not preclude a fair use finding. Although correct as a general statement, it applied in *Sony* to a narrow set of circumstances. Sony's copying equipment (Betamax VCRs) was used by members of the public to record television programs—the copyright of which was owned by plaintiffs. The question was whether Sony's selling of the copying equipment violated plaintiffs' rights under the Copyright Act. The Supreme Court said "no" because "time-shifting" for those watching a television program enlarges the viewing audience, and does not impair plaintiffs' commercial right in the value of the copyright. Hence, no basis existed under the Act upon which plaintiffs could hold Sony liable for selling VCR's to the general public. *Id.* at 421, 104 S.Ct. at 778.

*Rogers v. Koons,* 960 F.2d 301, 311 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992).

Moreover, in its most recent pronouncement on this issue, the Second Circuit, citing *Sony,* stated that "[t]hough this conclusion [that the plaintiff copied entire works] does not preclude a finding of fair use, it militates against such a finding, *see Sony,* 464 U.S. at 449–50, 104 S.Ct. at 792, and weights the third factor in favor of the [copyright owner]." *American Geophysical Union,* 37 F.3d at 894.

The situation here is factually distinguishable from *Sony*. In that case, the Court grounded its conclusion, at least in part, on the fact that the viewers had been invited to see the copyrighted work in its entirety free of charge and that the time-shifting made possible by the VCRs simply allowed them to choose the time at which to take advantage of this offer. Here, to the contrary, the moving plaintiffs have done everything they can to ensure that the test-taking public not gain access to its copyrighted materials. Moreover, in light of the general rule that wholesale copying such as the State has engaged in here mitigates against a finding of fair use, the court concludes that this factor weighs in favor of the moving plaintiffs.

### D. *Effect Upon the Potential Market or Value of the Copyrighted Work*

■ The fourth fair use factor considers "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor "[r]equires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the potential market' for the original." *Campbell*, — U.S. at —, 114 S.Ct. at 1177, 127 L.Ed.2d at 522 (citations omitted); *see also American Geophysical Union*, 37 F.3d at 894 n. 12. In addition, "[t]he enquiry 'must take account not only of harm to the original but also of harm to the market for derivative works.'" *Id.* (citing *Harper & Row, supra*, 471 U.S. at 568, 105 S.Ct., at 2234).[21]

■ The State argues that the burden of proof on this factor is squarely upon the moving plaintiffs.[22] *See* State's Memorandum of Law at 26. Moreover, the State asserts that "'[t]he fourth factor disfavors a finding of fair use only when the market is impaired because the quoted material serves the consumer as a substitute.'" *See id.* at 27 (quoting Leval, *Toward A Fair Use Standard*, 103 Harv.L.Rev. 1105, 1125 (1990)). Finally, the State contends that there is a factual dispute as to whether once a particular question or test form is disclosed it must be retired and never used again. *See id.* at 27–28.

With respect to this last argument, the State relies upon the previous testimony of its expert, Professor Haney, that "the negative effect of the disclosure of individual test questions will dissipate over time, as individual test-takers find it more productive to actually learn the subject matter being tested, rather than memorizing an ever-growing body of questions and answers that appeared in previously disclosed tests, in hopes that they might again be used." *See id.* at 28. Moreover, the State contends that the moving plaintiffs' argument that it would be imprudent to institute the repeat use of previously disclosed questions on a large scale because of a lack of empirical testing on the subject is their own fault because "[t]he lack of empirical study on this subject is directly attributable to the fact that the plaintiffs hold a monopoly position, in which they exercise exclusive control over the content of admission tests and the data pertaining to students' performance on such tests." *See id.* at 29.

American Geophysical Union, 37 F.3d at 894.

---

**21.** As the Second Circuit noted in *American Geophysical Union*,

[p]rior to *Campbell*, the Supreme Court had characterized the fourth factor as "the single most important element of fair use," *Harper & Row*, 471 U.S. at 566, 105 S.Ct. at 2233; *accord* 3 *Nimmer on Copyright* § 13.05[A][4], at 13–183. However, *Campbell*'s discussion of the fourth factor conspicuously omits this phrasing. Apparently abandoning the idea that any factor enjoys primacy, *Campbell* instructs that "[a]ll [four factors] are to be explored, and the results weighed together, in light of the purposes of of copyright." — U.S. at —, 114 S.Ct. at 1171.

**22.** This argument cannot be squared with the Supreme Court's recent statement in *Campbell* that "[s]ince fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets." *Campbell*, — U.S. at — and n. 21, 114 S.Ct. at 1177 and n. 21, 127 L.Ed.2d at 522 and n. 21. Thus, the court concludes that it is the State that must demonstrate that its use of the moving plaintiffs' copyrighted material does not have an adverse effect upon the potential market or value of such work.

With respect to the test forms themselves, the State notes that given the moving plaintiffs' argument that under no circumstances could they reuse an entire form that previously had been disclosed, "[i]t would have been helpful if the plaintiffs were more fact-specific regarding the effort that goes into creating forms, by informing the Court how many staff are necessary to do this and how many [person]-hours actually go into creation of a particular test." *See id.* In this regard, the State notes that "[i]n a recent article cited in Dr. Haney's affidavit, with the assistance of computer programming, at least one of the plaintiffs is capable of generating test forms 'with the push of a button.' " *See id.* (quoting Haney Declaration at ¶ 24).

The State also asserts that despite the moving plaintiffs' argument concerning the harm that will befall them if the court denies their motion, they are less likely than GMAC was in 1992 to be adversely affected by such a denial because they have a much larger population of test-takers subject to each administration of their tests and they have had three additional years of administering tests for the purposes of developing a large item pool. *See id.* at 30. Moreover, with respect to the cost of developing each test form, the State argues that the moving plaintiffs fail to acknowledge that they charge a substantial registration fee; fail to inform the court how much of each fee is actually used to develop items or to construct test forms; ignore the fact that they hold a monopoly position which results in a captive audience which virtually assures them a market, regardless of the price of admission; forget that the STA permits them to recoup the reasonable costs they incur as a result of their compliance with the disclosure requirements; and fail to inform the court how much money they recover through the commercial sale of disclosed test forms. *See* State's Memorandum of Law at 31. Finally, the State contends that as long as the moving plaintiffs' tests are required for admissions, they will have a market for their tests, regardless of whether the test forms are disclosed after their use; that the moving plaintiffs have availed themselves of the market for disclosed test forms by selling them in bookstores; and that any expenses they incur in creating new ques-

tions and forms to replace those disclosed are offset by the profits generated through this market. *See id.* at 31–32. Given all of these factual issues, the State concludes that only after discovery and a hearing will the court have an adequate record on which to determine which party this factor favors. *See id.* at 32.

The moving plaintiffs strongly disagree with the State's assertions regarding this fourth fair use factor. With respect to the impact of the disclosure on the value of a test form, they direct the court's attention to Professor Drasgow's affidavit in which he states that "[p]ublic disclosure of a test form destroys the value of the form (and its sections) as a unit." *See* Plaintiffs' Memorandum of Law at 27 (quoting Drasgow Declaration at ¶ 46). With respect to the impact of disclosure on the value of the individual test questions, the moving plaintiffs assert that testing professionals "have very serous (and warranted) concerns about the risks that would be posed by the pre-announced reuse of disclosed items on high-stakes tests." *See id.* at 29 (quoting Drasgow Declaration at ¶ 10). Due to the seriousness of these concerns, the moving plaintiffs contend that "[i]t would violate sound testing practice to reuse disclosed questions in the absence of empirical research indicating that such reuse does not harm the validity and fairness of the test." *See id.* at 30 (citing Drasgow Declaration at ¶¶ 8(b), 12, 34).

With regard to this last point, there appears to be only one empirical study that addresses the impact of the reuse of previously disclosed questions. *See* Gordon Hale, Paul Angelis, & Lawrence Thibodeau, *Effects of Test Disclosure on Performance on the Test of English as a Foreign Language,* 33 Language Learning 449 (1983) ("TOEFL Study"). The State has relied upon this study in the past to support its position that as the number of disclosed test forms increases the effect of such disclosure on the test-takers' results will decrease. *See GMAC Decision,* 788 F.Supp. at 143. The moving plaintiffs argue, to the contrary, that there are three problems with the State's reliance upon the one sentence in the TOEFL study which, arguably, supports this

view. *See* Plaintiffs' Memorandum of Law at 32 n. 28 (quoting TOEFL Study at 463–64) ("As more and more disclosed TOEFL tests become available, the effect of test disclosure should diminish to a negligible level, eventually allowing disclosed TOEFL items to be reused in institutional test forms."). First, the moving plaintiffs argue that even if individual questions could be reused freely, the disclosure of a test form still would destroy the value of the form as an integrated whole. *See id.* Secondly, they assert that the authors of the TOEFL study did not suggest that individual test items eventually might be reused in admissions testing, which is at issue here, but only in institutional testing— testing done by colleges for placement purposes. *See id.* (citing Drasgow Declaration at ¶ 24, Angelis Declaration at ¶ 8; Yopp Declaration at ¶ 9). Finally, they contend that even with respect to institutional testing, the TOEFL study authors engaged in speculation which was not supported by their data. *See id.* (citing Drasgow Declaration at ¶¶ 24, 28–29 and n. 4).

Finally, in a footnote to their memorandum of law, the moving plaintiffs note a third form of harm that is relevant to the court's analysis of this fourth fair use factor. In this regard, they state that they derive revenue from the sale of copies of disclosed tests and from licensing of disclosed questions. *See* Plaintiffs' Memorandum of Law at 33 n. 29. They assert that by requiring that all administered test forms be made available to the public, the STA significantly impairs their ability to engage in normal methods of exploitation of copyrighted works. *See id.*

In addition to the affidavits of the moving plaintiffs' expert Professor Drasgow and the State's expert Professor Haney, the court has before it the transcript of Professor Haney's deposition which the moving plaintiffs conducted subsequent to the filing of the present motion. The moving plaintiffs assert that this deposition testimony disposes of whatever factual disputes may have existed regarding the effect of the disclosure of test forms and individual test questions upon their value to the moving plaintiffs. In this regard, the moving plaintiffs contend that "Professor Haney's testimony shows that, in

fact, he agrees with plaintiffs' experts on the crucial issues here." *See* Plaintiffs' Reply Memorandum at 19. To support this argument, the moving plaintiffs direct the court's attention to the following excerpts from Professor Haney's deposition:

Q. Would it be responsible for a high-stakes testing organization to implement a major change in its testing policies based on your hazarding a guess about what it is plausible would happen as a result?

MR. ROBERTS: Objection to the form of the question. Go ahead.

A. I would certainly not advocate them making such a change based on my theoretical reasoning about plausibility. I would reiterate the statement that I made in 1992 about considerable empirical research needing to be made in order to more closely fix answers to some of the open practical and technical questions. .

Haney Deposition Transcript at 66–67.

\* \* \* \* \* \*

Q. Does the Kulik, Kulik and Bangert study make you feel comfortable that it would be prudent and responsible for high-stakes college and graduate school admissions tests to re-use disclosed questions?

A. It suggests, as I mentioned in my affidavit, that it seems entirely plausible, but no, **I would not recommend re-use of previously disclosed forms without additional research.**

MR. ROBERTS: The question was previously used questions, not forms.

A. Previously used questions or forms, yes.

Haney Deposition Transcript at 95 (emphasis added).

\* \* \* \* \* \*

A. ... As I have indicated I think on several occasions, clearly **more empirical technical work would have to be done in order to give me confidence about re-using questions in a manner that would not threaten the validity of**

inferences made from re-using previ- **ously disclosed questions.**

Haney Deposition Transcript at 145 (emphasis added).

\* \* \* \* \* \*

Q. Would you also agree to ... **the unde- sirability of test disclosure to the ex- tent that it does jeopardize the validi- ty of inferences drawn from future test use?**

A. Yes.

Haney Deposition Transcript at 164 (emphasis added).

Based upon this testimony, the moving plaintiffs assert that

[t]here is no dispute between the parties about the key factual points: that there are major and unresolved concerns about the reuse of disclosed questions in high-stakes admissions testing, and that testing programs such as the SAT, GRE, and TOEFL cannot now responsibly reuse disclosed test questions or forms. Defendants have therefore not come close to meeting their burden of proof that forced disclosure of secure tests does not substantially reduce the value of those tests.

See Plaintiffs' Reply Memorandum of Law at 21.

Given the fact that the State had not had an opportunity to respond to the moving plaintiffs' interpretation of Professor Haney's deposition prior to oral argument, the court asked counsel for the State if he wished to call any witnesses to testify concerning the issues raised by the fourth fair use factor. The State accepted the court's invitation and called Professor Walter Haney to testify on its behalf.[23]

Professor Haney testified about a number of issues concerning which he asserted that he and Professor Drasgow had some possible areas of disagreement. The court found this testimony helpful to its understanding of the current issues being studied in the field of standardized testing. Nonetheless, much of what Professor Haney had to say shed little

light upon the precise issue the court must decide—whether or not the STA's disclosure requirements have an adverse effect upon the potential market or value of the moving plaintiffs' copyrighted materials.

Nonetheless, some of Professor Haney's testimony was helpful to the court's determination of the issue at hand. In this regard, Professor Haney stated that although it was no longer an issue whether previously disclosed questions could be reused, what remained at issue was under what conditions and to what extent these questions could be reused. He also testified that additional research was necessary to determine the feasibility of the reuse of previously disclosed test questions and forms. In addition, he explained that there is a middle ground between reusing previously disclosed test questions and test forms, namely, reusing previously disclosed test sections. With respect to this issue, he stated that he agreed with Professor Drasgow that previously disclosed test forms could not be reused, unless there were a very large number of them available. Likewise, he agreed that questions existed regarding the conditions and extent to which previously disclosed test questions could be reused. Nonetheless, he stated that the moving plaintiffs had reused previously disclosed test sections within otherwise undisclosed test forms, although no studies had been done regarding the effects of such reuse. Finally, when asked if he had an opinion as to whether anything but a lack of empirical studies stood in the way of the moving plaintiffs reusing previously disclosed test questions, he responded that the results of any such studies would need to be ascertained before the moving plaintiffs could reuse such questions.

When all is said and done, the basic question which this court must answer is whether the moving plaintiffs' test forms and questions have any value to them once they are disclosed to the public. In light of Professor Haney's testimony that additional empirical studies need to be completed before he could

---

**23.** The court also afforded the moving plaintiffs an opportunity to call witnesses on their behalf. The moving plaintiffs declined the invitation based upon their belief that Professor Haney's deposition testimony disposed of any factual disputes regarding the relevant issues necessary to the court's determination of this factor.

recommend that the moving plaintiffs systematically reuse previously disclosed test items and forms, this question must be answered in the negative. Professor Haney's in-court testimony was entirely consistent with that portion of his deposition testimony which supports the moving plaintiffs' argument that they cannot responsibly re-use previously disclosed test forms and individual test questions. If they cannot reuse these materials, it follows that they have lost substantially, if not all, their value to the moving plaintiffs whose primary function is to provide valid testing instruments to the public for admissions purposes.[24] Given the present state of concern over the feasibility of reusing previously disclosed test forms and questions while maintaining the fairness and validity of the same, the court concludes that this factor weighs in favor of the moving plaintiffs.

### E. Aggregate Fair Use Assessment

■ To reiterate, the court finds that the second, third and fourth fair use factors weigh in favor the moving plaintiffs, while the first factor weighs in favor of neither party. Therefore, the court concludes that the State has failed to meet its burden of proof that its use of the copyrighted works constitutes a fair use within the meaning of § 107. Accordingly, the court holds that the moving plaintiffs have demonstrated a likelihood of success on the merits of their claim that the STA infringes upon their rights under the Copyright Act.

### III. Irreparable Injury

■ "In a copyright infringement action the existence of irreparable injury is presumed upon a showing of a prima facie case of copyright infringement." *Video Trip Corp. v. Lightning Video, Inc.*, 866 F.2d 50, 51–52 (2d Cir.1989); *see also Hasbro Brad-*

*ley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 192 (2d Cir.1985); *Saban Entertainment, Inc. v. 222 World Corp.*, 865 F.Supp. 1047, 1055 (S.D.N.Y.1994). As the Second Circuit recently stated, however, "[t]his is only a presumption, ..., and it vanishes if the copyright holder unreasonably delays prosecuting his infringement claim." *Fisher–Price, Inc. v. Well–Made Toy Mfg. Corp.*, 25 F.3d 119, 124 (2d Cir.1994) (citing *Bourne*, 976 F.2d at 101). Moreover, the court explained that " '[l]ack of diligence, standing alone, may ... preclude the granting of preliminary injunctive relief, because it goes primarily to the issue of irreparable harm....' " *Id.* (quoting *Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (2d Cir.1985) (per curiam)).

The State asserts that the moving plaintiffs' delay in seeking injunctive relief belies their claim that the STA's disclosure requirements would cause them irreparable harm. *See* State's Memorandum of Law at 15. In this regard, the State contends that the moving plaintiffs' decision to wait more than 10 years after the effective date of the STA before instituting the present suit completely " 'undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.' " *See id.* at 16 (quoting *Le Sportsac, Inc. v. Dockside Research, Inc.*, 478 F.Supp. 602, 609 (S.D.N.Y.1979)). Moreover, the State argues that the moving plaintiffs can avoid the allegedly harmful effects of full disclosure by offering only as many tests in New York as they wish to disclose. *See id.* at 18. With respect to this point, the State notes that even with fewer administrations of their tests in New York, the moving plaintiffs will not be adversely affected because the same number of students will take the tests. *See id.* Finally, the State urges that given the laudable goals of the STA, the "Court should decline to eviscerate a statute

**24.** The court recognizes that there is a secondary market for disclosed test forms and questions and that the moving plaintiffs have availed themselves of this market. With respect to this market, however, it is uncontroverted that the STA's disclosure requirements have the potential to infringe upon the moving plaintiffs' ability to reap the full benefits of the same. Moreover, whatever the value of this secondary market, the fact remains that the moving plaintiffs' primary func-

tion is to provide valid testing instruments to the test-taking public. With respect to this primary market, Professor Haney's testimony supports the moving plaintiffs' contention that, given the present concerns of professionals in the field of standardized testing about whether the reuse of previously disclosed test forms and questions affects the validity and fairness of these test instruments, such disclosure destroys the value of these copyrighted materials.

... merely to facilitate the plaintiffs' desire to offer additional, unregulated, test administrations in New York." *See id.*

To the contrary, the moving plaintiffs assert that if the court does not grant their motion for preliminary injunction, they will suffer irreparable harm. In this regard, the moving plaintiffs note that "[i]f the Court were to deny the motion, the SAT, GRE, and TOEFL programs would be forced to cancel 13 administrations in New York State during the 1995–1996 testing year alone." *See* Plaintiffs' Memorandum of Law at 36. If they do this, students who must take these examinations either will have to travel out of state or take the tests at a less convenient time. *See id.* Moreover, they assert that they will suffer irreparable harm to their reputations and their ability to serve the New York State test-taking population. *See id.* (citing Dietrich Declaration at ¶¶ 29–30, 33; Stewart Declaration at ¶¶ 20–21; Yopp Declaration at ¶¶ 14–15).

With respect to the State's argument that they have waited too long to seek this relief, the moving plaintiffs argue that such a suggestion is nonsense. *See* Plaintiffs' Reply Memorandum of Law at 28. To demonstrate why this is so, they offer several arguments. First, they note that they originally filed this motion in 1990, shortly after they commenced this action. *See id.* At that time, the State consented to the relief the moving plaintiffs sought and has continued to consent to similar relief every year since then. *See id.* Therefore, the moving plaintiffs argue that for the State to contend that it is too late for them to seek this relief when the reason they did not seek it earlier is the State's stipulation to the relief requested is astounding. *See id.* at 28–29.[25]

Secondly, the moving plaintiffs argue that the present motion concerns test forms that are to be administered next year and in future years, not test forms administered previously. *See id.* at 29. In this regard, the moving plaintiffs note that within days after the State refused to extend the stipulations into the next testing year, they met with the State and the Court to establish a briefing schedule for this motion.

Third, the moving plaintiffs contend that they filed the instant lawsuit promptly after this court clarified the law on preemption of the STA in its *AAMC I* decision in 1990. *See* Plaintiffs' Reply Memorandum of Law at 30. Fourth, they state that the State's suggestion that they, like GMAC, "successfully lived" with the STA during the 1980's is incorrect. *See id.* at 30. In this regard, the moving plaintiffs assert that unlike GMAC, they did not disclose all of their administrations during the 1980's. Rather, they were forced to withdraw many of their administrations from New York because they could not disclose those administrations. *See id.* at 30–31 (citing *GMAC Decision,* 788 F.Supp. at 138 n. 4). Finally, the moving plaintiffs argue that because the administrators of the SAT and GRE tests need to reduce the number of disclosed paper-and-pencil administrations of those tests during the mid-1990's, their need for injunctive relief is more acute than in the 1980's. *See id.* at 31 and n. 24.

The present case presents a unique set of circumstances against which the court must determine whether the presumption of irreparable harm has been overcome. The most analogous situation is, of course, that which this court addressed in its earlier decision in this case involving GMAC's request for a preliminary injunction. In that decision, the court concluded, unlike here, that GMAC had not demonstrated a likelihood of success on the merits of its copyright infringement claim. Thus, its discussion of the irreparable harm element of GMAC's motion was purely dicta. Furthermore, in support of its conten-

---

**25.** The moving plaintiffs also correctly note that the State's footnote reference to laches is not applicable to the present situation. *See* Plaintiffs' Reply Memorandum of Law at 29 n. 21 (citing State's Memorandum of Law at 15 n. 3). To prove laches, the State would have to demonstrate that the moving plaintiffs inexcusably delayed in taking action and that the State would be prejudiced if the moving plaintiffs belatedly asserted their rights. *See Tri–Star Pictures, Inc. v. Leisure Time Productions,* 17 F.3d 38, 44 (2d Cir.1994). The moving plaintiffs assert that even if the State could demonstrate that they have inexcusably delayed in bringing this motion, the State has not, and could not, claim any prejudice from the passage of time. *See* Plaintiffs' Reply Memorandum of Law at 29 n. 21.

tion that it would suffer irreparable harm if the court denied its motion, GMAC presented only two arguments: (1) that because it had established a prima facie case of copyright infringement, it was entitled to a presumption of irreparable injury and (2) that because it had alleged deprivations of its constitutional rights, no further showing of irreparable harm was necessary. *See GMAC Decision,* 788 F.Supp. at 144. The court rejected the first of these arguments based upon its conclusion that GMAC had not demonstrated a likelihood of success on the merits of its claim. *See id.* Likewise, the court rejected GMAC's alternative argument because GMAC had not even attempted to demonstrate a likelihood of success on the merits of its constitutional claims. *See id.* n. 10.

In its previous decision, the court also discussed the effect of delay on its decision not to grant GMAC the preliminary relief it sought. In that regard, the court noted that GMAC as well as the moving plaintiffs had waited 10 years after the effective date of the STA to commence this suit. *See GMAC Decision,* 788 F.Supp. at 145. In addition, the court stated that GMAC voluntarily continued to comply with the STA disclosure requirements as to all its test forms for another year and then agreed to disclose two of its four tests for yet another year before moving for preliminary relief. *See id.* at 145. The court, at that time, also found unpersuasive GMAC's argument that it would be irreparably injured each time one of its individually copyrighted test forms was disclosed because GMAC could have made this same argument at any time during the previous ten years. *See id.*

As noted above, GMAC's position in 1992 is somewhat different from that of the moving plaintiffs. First of all, they, unlike GMAC, moved for preliminary relief very shortly after they filed suit in 1990. Moreover, it is undisputed that the moving plaintiffs did not disclose all their test forms during the 1980's. Instead, they decreased the number of test administrations in New York State rather than comply fully with the STA. In addition, since 1990, including the three years since this court issued the

*GMAC Decision,* the State has stipulated to a reduced amount of disclosure, in spite of the requirements of the STA, in exchange for the moving plaintiffs' agreement to offer additional nondisclosed test administrations in New York during each testing year. Finally, and most importantly, the court notes that the moving plaintiffs have, unlike GMAC, demonstrated to the court's satisfaction a likelihood of success on the merits of their copyright infringement claim. Under such circumstances, the court concludes that the moving plaintiffs have not unduly delayed in bringing this motion. Furthermore, any such delay that may have occurred has in no way prejudiced the State. Nor, given its past agreement to relief similar to that which the moving plaintiffs now seek, can the State claim that it will be prejudiced if the court grants the present motion. Accordingly, the court concludes that the moving plaintiffs are entitled to a presumption of irreparable harm in this action.

## CONCLUSION

Having concluded that the moving plaintiffs have demonstrated both a likelihood of success on the merits of their copyright infringement claim and that they are entitled to the presumption of irreparable injury normally afforded plaintiffs in a case such as this, the court grants their motion for a preliminary injunction. However, the court finds that rather than the broad injunction which the moving plaintiffs request; i.e., one which would preclude the State from enforcing §§ 341 and 342 of the STA against them pending the outcome of this litigation, the injunction should be more narrowly tailored.

First of all, as the court noted at oral argument, even though the moving plaintiffs sought to enjoin the enforcement of § 341 of the STA in their notice of motion, they never addressed this particular section of the statute in their papers. Although the court provided them with an opportunity to do so at oral argument, they were unable to demonstrate to the court how they would suffer irreparable injury if the court did not grant them a preliminary injunction with respect to the enforcement of this section. Accordingly, the court denies the moving plain-

tiffs' motion with respect to § 341 of the STA.

■ To the contrary, the court concludes that the moving plaintiffs are entitled to a preliminary injunction with respect to § 342 of the STA. The purpose of such an injunction "[i]s to maintain the *status quo ante* pending a full hearing on the merits." *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985) (citations omitted). As defined in Black's Law Dictionary, the " ' "[s]tatus quo" to be preserved by a preliminary injunction is the last actual, peaceable uncontested status which preceded the pending controversy.' " *LaRouche v. Kezer,* 20 F.3d 68, 74 n. 7 (2d Cir.1994) (quoting Black's Law Dictionary 1410 (6th ed. 1990)).

Applying this definition to the facts of the present case, the court finds that the "status quo" with respect to § 342 of the STA is the level of test disclosure embodied in the stipulations in effect for the 1994–1995 testing year. Therefore, during the 1995–1996 test year, and for each test year thereafter until such time as the court reaches the merits of this case, the College Entrance Examination Board shall disclose up to four SAT test forms used to administer the SAT in New York in accordance with the requirements of § 342 of the STA. If the College Entrance Examination Board chooses to offer less than four administrations of the SAT in New York during the 1995–1996 test year or during any test year thereafter, they shall disclose all such tests in accordance with the requirements of § 342 of the STA. Finally, if the College Entrance Examination Board offers more than four administrations of the SAT in New York during the 1995–1996 test year or during any test year thereafter, they need not disclose such test forms. With respect to any such tests, however, the registration materials for those tests shall contain a notice that those individuals who take such tests will not be entitled to receive a copy of the test form, answer key, or their answer sheets.

Furthermore, during the 1995–1996 test year, and for each test year thereafter until such time as the court reaches the merits of this case, the Graduate Record Examinations Board shall disclose up to two copyrighted test forms and the Test of English as a Foreign Language Policy Council shall disclose up to five copyrighted test forms in accordance with the requirements of § 342 of the STA. If either of these testing organizations chooses to offer less than the number of test administrations listed above in New York during the 1995–1996 test year or during any test year thereafter, they shall disclose all such tests in accordance with the requirements of § 342 of the STA. Finally, if either the Graduate Record Examinations Board or the Test of English as a Foreign Language Policy Council decides to offer in excess of the number of test administrations listed above, they need not disclose such test forms. With respect to such tests, however, the registration materials for those tests shall contain a notice that those individuals who take such tests will not be entitled to receive a coy of the test form, answer key, or their answer sheets.

Finally, the court notes that the limited nature of this preliminary injunction in addition to maintaining the status quo, is intended to take into account the competing public interests served by each of the parties to this action. In this regard, the court is in full agreement with the State that the STA serves laudable goals which address important public concerns about standardized testing. Similarly, the moving plaintiffs' ability to provide reliable and valid test forms and test questions to the test-taking public and the institutions which rely upon these materials as one factor to be considered in the admissions process is best served, at least at this stage of the litigation, by maintaining the current level of disclosure.

**IT IS SO ORDERED.**