# Whether Government Reproduction of Copyrighted Materials is a Noninfringing "Fair Use"

Although government reproduction of copyrighted material for governmental use would in many contexts be a noninfringing fair use under section 107 of the Copyright Act of 1976, such government reproduction of copyrighted material does not invariably qualify as a "fair use "

April 30, 1999

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF COMMERCE

You have requested an opinion from this Office on a legal question raised in connection with an attempt by the Copyright Clearance Center, Inc. ("CCC") to negotiate licenses with the Department of Commerce and other federal government agencies, pursuant to which such agencies would, in exchange for a fee, obtain permission to reproduce certain copyrighted materials by photocopying.[1] *See* Letter for Dawn E. Johnsen, Acting Assistant Attorney General, Office of Legal Counsel, from Andrew J. Pincus, General Counsel, Department of Commerce at 1 (June 23, 1998) ("Pincus Letter"). You inform us that a "key factor in our decision whether such negotiations [with the CCC] even are appropriate is whether there are any circumstances under which the Copyright Act might require a government agency to obtain such a license: if a license is never necessary, there would be no reason to consider entering into negotiations with the CCC, or with individual authors of works." *Id.* Accordingly, you have asked for our opinion on the following question: "whether a government agency ever is required to secure either permission or licensing before making unauthorized reproduction and use of materials that are protected by copyright law, or whether *all* government reproduction and use of such materials per se qualifies for the 'fair use' exception from the obligations of the Copyright Act." *Id.* You further assert that "[t]here appears to be substantial disagreement within the government with respect to this issue." *Id.* In particular, you suggest that the Commercial Litigation Branch of the Department of Justice's Civil Division may have conveyed to certain agencies the view that "virtually all photocopying for government use is permitted under the fair use doctrine," and that that view of the Commercial

---

[1] The CCC, a nonprofit consortium, or "clearing house," established in 1977, acts as an agent for participating publishers. Under one of the CCC's offered services, a user pays a flat fee, in exchange for which it receives a blanket annual license to make photocopies for internal use of any copyrighted material contained in any of the works registered with the CCC. The license fee is based on a limited photocopying survey that accounts for the licensee's employee population and the copying fees for the journals regularly copied by that licensee Upon payment of the fee, the licensee is authorized for a specified term to make unlimited numbers of photocopies, for internal use, from CCC-registered publications The revenue that the CCC derives from the licensee then is allocated among the publishers that have registered publications with the CCC, with the CCC retaining certain service charges *See American Geophysical Union v. Texaco, Inc.*, 802 F. Supp 1, 7–8 (S.D N.Y 1992) (discussing this CCC licensing practice), *aff'd*, 60 F.3d 913 (2d Cir 1994), *cert. dismissed*, 516 U.S. 1005 (1995)

Litigation Branch was "based upon the decision in *Williams & Wilkins Co. v. United States*, 487 F.2d 1345 (Ct. Cl. 1973), *aff'd by an equally divided Court*, 420 U.S. 376 (1975)." *Id.* at 2.

As we explain below, while government reproduction of copyrighted material for governmental use would in many contexts be noninfringing because it would be a "fair use" under section 107 of the Copyright Act of 1976, 17 U.S.C. § 107 (1994), there is no "per se" rule under which such government reproduction of copyrighted material invariably qualifies as a fair use.[2] It is important to note, however, that we have been unable to discern any disagreement within the federal government on this specific question: To our knowledge, no agency of the executive branch has argued, or advised, that government copying is per se a fair use. In particular, the Department of Justice did not urge such a categorical rule in the *Williams & Wilkins* litigation, *see infra* note 15 (brief for the United States in the Supreme Court did not dispute that photocopying by the government may in some circumstances constitute copyright infringement); and, to our knowledge, the Department has not thereafter proffered any arguments, nor provided any advice, inconsistent with the views expressed in that brief.[3]

We do not, in this opinion, reach any conclusions about the circumstances under which government agencies should negotiate to obtain photocopying licenses. We caution, however, that a general practice of government agencies entering into licensing agreements in which they pay licensing fees for uses that *are* fair may, over time, undermine the government's ability to argue successfully that such uses are fair. For this and other reasons, government agencies may wish to ensure that, if they do negotiate licensing arrangements, such arrangements cover only those government photocopying practices that otherwise would, in fact, be infringing.

In Part I of this opinion, we provide some background on the fair use doctrine. In Part II, we review the case law regarding government photocopying and fair use, as well as Congress's enactment of the Copyright Act of 1976, and conclude that government photocopying of copyrighted materials does not invariably qualify as a fair use. Finally, in Part III, we provide some guidance on the factors that an agency should consider in determining whether a particular photocopying practice would be a fair use and whether to negotiate a license with respect to particular photocopying practices.

---

[2] In framing the particular question you have asked us to consider, you refer to "unauthorized reproduction and use of materials that are protected by copyright law." Pincus Letter at 1. The bulk of your letter and supporting materials, however, indicates that your inquiry specifically concerns "photocopying for government use." *Id* at 2 Accordingly, we will in this opinion focus, not on all potential federal government uses of copyrighted materials, but instead, on government photocopying of copyrighted materials for internal government use. We note, in particular, that this opinion does not specifically consider the circumstances under which it would be a fair use for an agency to republish copyrighted materials in government publications or in publicly available databases.

[3] Indeed, a Department of Energy memorandum that you provided as an attachment to your letter indicates that the Commercial Litigation Division of the Department of Justice has informed the Department of Energy that, in its view, some cases of government photocopying likely would not be fair uses. *See* Memorandum for Jim Chafin and All Field Offices, from Paul A Gottlieb, Assistant General Counsel for Technology Transfer and Intellectual Property, United States Department of Energy, *Re: Copyright Clearance Center* at 2 (May 23, 1995).

## I. *The Fair Use Doctrine*

Article I, Section 8 of the Constitution empowers Congress to "promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. Pursuant to that power, Congress enacted the Copyright Act of 1976, Pub. L. No. 94–553, 90 Stat. 2541 (1976) (codified as amended at 17 U.S.C. § 101 et seq. (1994)) (the "Copyright Act" or the "1976 Act"). Section 106 of the Copyright Act provides, *inter alia*, that the owner of a copyright under Title 17 of the United States Code "has the exclusive rights . . . to reproduce the copyrighted work in copies," and to "authorize" such reproduction. 17 U.S.C. § 106(1) (1994). Those "exclusive rights," however, are "[s]ubject to" limitations codified in "sections 107 through 120" of the 1976 Act. *Id.* § 106. For present purposes, the most important of those limitations is found in section 107 of the Copyright Act, *id.* § 107. That section, which is entitled "Limitations on exclusive rights: Fair use," provides, in pertinent part:

> Notwithstanding the provisions of section[ ] 106 . . ., the fair use of a copyrighted work, including such use by reproduction in copies . . ., for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include —
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

Section 107's "fair use" limitation on copyright, and the particular factors enumerated in that section, reflect and incorporate a longstanding common law doctrine. *See Harper & Row, Publishers, Inc. v. The Nation Enters.*, 471 U.S. 539, 549 (1985). From the "infancy of copyright protection," courts have found it necessary to provide some opportunity for fair use of copyrighted materials in order "to fulfill copyright's very purpose, '[t]o promote the Progress of Science

and useful Arts.' " *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994). Before enactment of the 1976 Act, however, the fair-use doctrine was "exclusively [a] judge-made doctrine." *Id.* at 576. When it codified the fair use doctrine in section 107 of the 1976 Act, "Congress meant 'to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way' and intended that courts continue the common-law tradition of fair use adjudication." *Id.* at 577 (quoting H.R. Rep. No. 94–1476, at 66 (1976) ("House Report"), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5679; S. Rep. No. 94–473, at 62 (1975) ("Senate Report")); *accord Harper & Row*, 471 U.S. at 554.[4]

As noted above, the fair use doctrine, like the copyright protections that it qualifies, is necessary in order "to fulfill copyright's very purpose, '[t]o promote the Progress of Science and useful Arts.' " *Campbell*, 510 U.S. at 575; *see also, e.g., Harper & Row*, 471 U.S. at 545 ("copyright is intended to increase and not to impede the harvest of knowledge"). As the Supreme Court recently emphasized, "[t]he fair use doctrine thus 'permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.' " *Campbell*, 510 U.S. at 577 (quoting *Stewart v. Abend*, 495 U.S. 207, 236 (1990) (internal quotation marks and citation omitted)).[5]

---

[4] In 1992, Congress added the following sentence to the end of 17 U S C § 107, in order to clarify that the fair-use limitation is applicable to unpublished works: "The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors " Pub L No. 102–492, 106 Stat 3145 (1992). Arguably, application of the fair use doctrine to unpublished works is one way in which section 107 departs from the common law. *See, e g*, H.R Rep No 102–836, at 4 (1992) ("The common law, going back to late eighteenth century English cases, had been strict in prohibiting fair use of unpublished works under the theory that the author should decide when and in what form his or her work should first reach the public "), *reprinted in* 1992 U S C.C A.N. 2553, 2556; *Salinger v Random House, Inc*, 811 F.2d 90, 95 (2d Cir.) ("Though common law, especially as developed in England, appears to have denied the defense of fair use to unpublished works, *see* W. Patry, *The Fair Use Privilege in Copyright Law* 436–41 (1985), the 1976 Act explicitly makes all of the rights protected by copyright, including the right of first publication, subject to the defense of fair use."), *cert denied*, 484 U.S. 890 (1987); *New Era Publications Int'l, APS v Henry Holt & Co*, 695 F Supp. 1493, 1502 (S D N.Y 1988) (Copyright Act's application of fair use doctrine to unpublished work was "in departure from the common law rule"), *aff'd*, 873 F.2d 576 (2d Cir. 1989), *cert denied*, 493 U.S 1094 (1990) *But see Harper & Row*, 471 U.S. at 550–51 (although "fair use traditionally was not recognized [at common law] as a defense to charges of copying from an author's as yet unpublished works . . . [t]his absolute rule . . was tempered in practice by the equitable nature of the fair use doctrine")

[5] *See also* Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv L Rev 1105, 1110 (1990) ("The doctrine of fair use limits the scope of the copyright monopoly in furtherance of its utilitarian objective. . Fair use should not be considered a bizarre, occasionally tolerated departure from the grand conception of the copyright monopoly To the contrary, it is a necessary part of the overall design "); *Fogerty v Fantasy, Inc.*, 510 U S 517, 526–27 (1994) (quoting *Twentieth Century Music Corp. v. Aiken*, 422 U S 151, 156 (1975))·

The limited scope of the copyright holder's statutory monopoly . reflects a balance of competing claims upon the public interest: Creative work is to be encouraged and rewarded, but private motivation must ·ultimately serve the cause of promoting broad public availability of literature, music, and the other arts. The immediate effect of our copyright law is to secure a fair return for an 'author's' creative labor But the ultimate aim is, by this incentive, to stimulate artistic creativity for the general public good

## II. *Fair Use and Government Photocopying*

The federal government can be liable for violation of the copyright laws. Congress has expressly provided that a work protected by the copyright laws can be "infringed by the United States," 28 U.S.C. § 1498(b) (1994),[6] and further has provided that "the exclusive action which may be brought for such infringement shall be an action by the copyright owner against the United States in the Court of Federal Claims for the recovery of his reasonable and entire compensation as damages for such infringement," 28 U.S.C. § 1498(b) (Supp. III 1997). At the same time, it cannot be disputed that the federal government's copying (and other use) of copyrighted materials is subject to the fair use doctrine codified in 17 U.S.C. § 107.[7] It follows that any federal government photocopying that is a fair use is not infringing. However, there is no basis for concluding that the photocopying of copyrighted materials by the federal government automatically or invariably constitutes a fair use.

The case law provides very little guidance on the question of when government photocopying is a fair use. Reported cases involving application of the fair use doctrine to governmental conduct are rare. Indeed, the *Williams & Wilkins* decision, to which your letter refers and which we discuss below, is one of the only published opinions containing a significant discussion of governmental fair use.[8] And, outside the context of public schools, we have found only one case — involving circumstances far removed from those at issue in this opinion — in which a court has rejected a government's assertion that its use of copyrighted materials was fair.[9] What is more, even outside the context of governmental use,

---

[6] *See also* H.R. Rep. No 86–624, at 2 (1959) ("When the Government deliberately publishes a copyrighted article without obtaining the prior consent of the copyright proprietor, the general assumption would be that the holder, pursuant to the principles of 'just compensation' under the fifth amendment of our Constitution, should be entitled to an action against the Government for infringement ")

[7] There is nothing in the statute to suggest that the federal government cannot invoke the fair use doctrine. The legislative history indicates that certain governmental uses can be fair. *See infra* notes 19, 24 And the courts uniformly have assumed that the fair use analysis provided in section 107 of the Act applies to government uses of copyrighted materials *See, e.g.,* the cases cited in note 8, *infra*

[8] A few other cases contain less extensive discussion of governmental fair use. *See, e g , Association of Am. Med. Colleges v. Cuomo,* 928 F.2d 519, 523–26 (2d Cir.), *cert denied,* 502 U.S 862 (1991), *College Entrance Examination Bd. v Pataki,* 889 F. Supp 554, 564–75 (N.D N Y 1995), *Sinai v California Bureau of Automotive Repair,* No C–92–0274–VRW, 1992 WL 470699, at *3–*4 (N.D. Cal. Dec 21, 1992), *College Entrance Examination Bd. v Cuomo,* 788 F. Supp 134, 140–43 (N.D.N Y. 1992), *West v City of New York,* No 78 Civ. 1981 (MJL), 1985 WL 202, at *24–*25 (S.D N Y Jan. 18, 1985), *Key Maps, Inc. v. Pruitt,* 470 F. Supp 33, 37–38 (S.D Tex. 1978). Of these, only *West* and *Key Maps* involved decisions, necessary to the judgment, on the merits of the fair use question; and only *Key Maps* involved a government entity making and distributing multiple copies of copyrighted materials for internal government use

[9] *See College Entrance Examination Bd ,* 889 F Supp at 564–75. In that case, the district court, on a motion for preliminary injunction, found a likelihood of success on plaintiffs' infringement claim against a state government. That case did not involve government copying for internal government use. *See supra* note 2. Instead, the case involved a challenge to a state statute that required testing organizations to disclose copies of their copyrighted, confidential tests and related materials, and that further provided that such materials, once disclosed, would become public records.

There also are at least two decisions in which courts have found that a distribution of multiple copies of copyrighted materials to students in a public school was not a fair use. *See Marcus v Rowley,* 695 F.2d 1171, 1174–79 (9th

Continued

there is only a small handful of reported cases involving whether and under what circumstances photocopying is a fair use.[10]

The sole reported decision (apart from the classroom context) concerning whether government photocopying is a fair use is *Williams & Wilkins Co. v. United States*, 487 F.2d 1345 (Ct. Cl. 1973), *aff'd by an equally divided Court*, 420 U.S. 376 (1975). The plaintiff in that case challenged certain practices of the National Institutes of Health ("NIH") and the National Library of Medicine ("NLM"). The NIH library ran a photocopying service for the benefit of its research staff: On request, researchers could obtain a photocopy of an article from any of the journals in the library's collection, typically to assist them in their on-going projects or for background reading. As a general matter, NIH would agree to provide a requester only one copy of a particular article, only one article per journal issue, and no article of over 50 pages. In 1970, the library filled 85,744 requests for photocopies of journal articles (including journals published by Williams & Wilkins), constituting about 930,000 pages. *See* 487 F.2d at 1348. NLM is a repository of much of the world's medical literature, in essence a "librarians' library." *Id.* Upon request, NLM would provide photocopies of journal articles, free of charge, to other libraries and like research- and education-oriented institutions, both public and private (including commercial organizations, such as drug companies). NLM provided only one photocopy of a particular article per request, and would not honor a request for photocopying of an entire journal issue. In 1968, a representative year, NLM filled about 120,000 requests by photocopying journal articles. NLM made no effort to ascertain the ultimate use to which the

Cir. 1983), *Wihtol v. Crow*, 309 F.2d 777, 780–81 (8th Cir 1962) Such classroom cases may be instructive on the general matter of fair use in the context of reproduction for nonprofit purposes However, such cases typically involve archival collection or distribution of multiple copies of copyrighted materials that were, in the first instance, prepared and marketed primarily for use in the very same classroom setting. *See, e.g., Marcus*, 695 F.2d at 1175 We assume that the government photocopying practices about which you are concerned will rarely, if ever, involve federal government duplication for educational use in a classroom, or practices that fairly can be said to be analogous to those at issue in *Marcus* Of course, insofar as certain federal government practices are akin to those at issue in the classroom cases, then the courts' reasoning in decisions such as *Marcus* would be germane to the fair use analysis (The holding in *Wihtol* is of less practical value, since the court in that case merely held that "[w]hatever may be the breadth of the doctrine of 'fair use,' it is not conceivable to us that the copying of all, or substantially all, of a copyrighted song can be held to be a 'fair use' merely because the infringer had no intent to infringe " 309 F.2d at 780.) Furthermore, with respect to such cases it may be instructive to look to the legislative history of the 1976 Act, in which the House Committee on the Judiciary reproduced (i) an "Agreement on Guidelines for Classroom Copying in Not-for-Profit Educational Institutions with Respect to Books and Periodicals," which had been drafted by representatives of author/publisher and educational organizations, and (ii) a similar, more specialized set of "Guidelines for Educational Uses of Music," which had been drafted by representatives of music publishing and educational organizations *See* House Report at 66–72, *reprinted in* 1976 U.S.C.C.A.N at 5680–86. The House Committee expressed its belief that "the guidelines are a reasonable interpretation of the minimum standards of fair use" in the classroom context, *id.* at 72, *reprinted in* 1976 U.S C C A N at 5686, and the House and Senate Conferees "accept[ed]" the guidelines "as part of their understanding of fair use," H R Rep No. 94–1733, at 70 (1976), *reprinted in* 1976 U.S.C.C A N. 5810, 5811. (On the question of the legal effect, if any, of these guidelines, *see, e.g., Princeton Univ. Press v Michigan Document Servs., Inc.*, 99 F 3d 1381, 1390–91 (6th Cir 1996) (en banc), *cert. denied*, 520 U S 1156 (1997); *id* at 1410–12 (Ryan , J., dissenting); 4 Melville B Nimmer & David Nimmer, *Nimmer on Copyright* § 13 05[E][3][a], at 13–241–42 (1998) )

[10] *See, e g , Princeton Univ. Press*, 99 F.3d 1381; *American Geophysical Union v Texaco, Inc*, 60 F.3d 913 (2d Cir 1994), *cert. dismissed*, 516 U.S. 1005 (1995); *Duffy v. Penguin Books USA Inc.*, 4 F. Supp 2d 268, 274–75 (S D N.Y 1998), *Television Digest, Inc. v United States Telephone Ass'n*, 841 F. Supp. 5, 9–11 (D.D.C 1993); *Basic Books, Inc v Kinko's Graphics Corp.*, 758 F Supp 1522 (S D N Y 1991)

copied articles were put. Although NLM did provide some photocopies to institutions outside the government, NLM declined to provide to *non*-government libraries copies of articles published within the preceding five years in any of 104 journals included on a so-called "widely-available list." *Id.* at 1348–49.

The Court of Claims, in a 4-to-3 decision, held that the NIH and NLM photocopying practices were noninfringing because such practices were fair uses. The majority discussed at length eight separate "considerations which merge to that conclusion," *id.* at 1353:

(i) NIH and NLM are nonprofit institutions, *see id.* at 1354;

(ii) the libraries' photocopying policies were "within appropriate confines" — in particular, the libraries did not sell the copies, distribute them broadly, or, with slight exceptions by NLM, distribute the copies to nongovernmental entities, *id.* at 1354–55;

(iii) such library photocopying practices had long been carried out across the nation "with apparent general acceptance," *id.* at 1355–56;

(iv) medical science would be seriously hurt by a finding that such library photocopying was infringing, *see id.* at 1356–57;

(v) the plaintiff had failed to prove economic detriment as a result of the libraries' practices, *see id.* at 1357–59;

(vi) the statutory language and history were singularly unclear on the question, and it would be "less dangerous" to rule in favor of the libraries until Congress acted to clarify the fair use question, *id.* at 1359–61;

(vii) contemporaneous legislative history of proposed legislation (that had not yet resulted in the 1976 amendment of the copyright law) "indicate[d] the correctness of our general approach," *id.* at 1361; and

(viii) the law in many foreign countries was that such practices were not infringing, *see id.* at 1361–62.

The Court of Claims in its decision also urged Congress to enact legislation to resolve the difficult fair use questions raised by the increasingly prevalent practice of photocopying — questions that were, in the court's words, "preeminently a problem for Congress." 487 F.2d at 1360; *see also id.* at 1353, 1363 ("Hopefully,

the result in the present case will be but a 'holding operation' in the interim period before Congress enacts its preferred solution.'').

Williams & Wilkins appealed to the Supreme Court. In that Court, the Department of Justice argued that the Court of Claims correctly analyzed the fair use question, and that the Court should affirm the judgment in favor of the United States. *See* Brief for the United States, *Williams & Wilkins Co. v. United States*, 420 U.S. 376 (1975) (No. 73–1279); Paul Goldstein, *Copyright's Highway* 113–26 (1994) (describing Supreme Court proceedings). An equally divided Court, without opinion, affirmed the lower court judgment. *See* 420 U.S. 376 (1975).

Congress was well aware of the dispute in *Williams & Wilkins* and of the Court of Claims' plea that Congress enact legislation to resolve the difficult fair use questions raised in that case. *See, e.g.*, Senate Report at 71. And, in the 1976 Act, Congress did take three steps with respect to the matter of photocopying. First, in section 106 of the Act, Congress expressly affirmed that the rights of a copyright owner include the rights ''to reproduce the copyrighted work in copies'' and to ''authorize'' such reproduction. 17 U.S.C. § 106(1) (1994).[11] Second, the text of section 107 of the Act — in which Congress for the first time formally codified the fair use doctrine — expressly provides that ''reproduction in copies . . . for purposes such as . . . news reporting, teaching . . ., scholarship, or research,'' can be ''the fair use of a copyrighted work.'' Finally, in section 108 of the Act, Congress provided that certain forms of library and archival photocopying are not infringing, *see* 17 U.S.C.A. § 108 (West 1996 & Supp. 1999), thereby creating a discrete carve-out, or safe harbor, that does not ''in any way affect[ ] the right of fair use as provided by section 107,'' 17 U.S.C. § 108(f)(4) (1994). However, Congress did not otherwise resolve the fair use questions raised in *Williams & Wilkins*, and, in particular, did not identify the circumstances under which photocopying — and government photocopying in particular — would, or would not, constitute fair use under section 107 of the 1976 Act.[12] Instead, as explained above, Congress simply enacted 17 U.S.C. § 107 in

---

[11] As the court in *Williams & Wilkins* indicated, *see* 487 F.2d at 1350–51, 1359, there had been some question whether, under the then-existing copyright laws, the exclusive rights of the copyright owner included the right to control the copying of books and periodicals for personal use. *See also* Brief for the United States at 16 n 26, *Williams & Wilkins Co. v. United States*, 420 U.S 376 (1975) (No 73–1279) (discussing this question).

[12] In a memorandum attached to your letter, counsel for the CCC argue that section 108 of the 1976 Act ''expressly proscribes the copying at issue in *Williams & Wilkins*,'' and that congressional enactment of section 108 ''signalled Congressional disapproval of [*Williams & Wilkins*] on fair use grounds, and instead indicated that the photocopying activities in question should be covered by a separate statutory provision, namely Section 108.'' Memorandum of Weil, Gotshal & Manges LLP, Re: *Government Photocopying as Copyright Infringement* at 22–23 (July 30, 1997) (''Weil, Gotshal Memo''). *See also* United States Information Infrastructure Task Force, *Intellectual Property and the National Information Infrastructure: The Report of the Working Group on Intellectual Property Rights*, at 82 n.262 (Sept. 1995) (''White Paper'') (''precedential value of *Williams & Wilkins* may be reduced'' because of, *inter alia*, ''Section 108's proscription on most 'systematic' photocopying''), *quoted with approval in* Weil, Gotshal Memo at 22; William F. Patry, *The Fair Use Privilege in Copyright Law* 210 (2d ed 1995) (''In 1976, Congress by subjecting the activity before the Court of Claims to a statutory exemption in Section 108 of the Copyright Act, available only to libraries and archives qualifying under Section 108(a) and then only in the enumerated instances described in Sections 108(d), 108(e), and further subject to the conditions of Section 108(g), indicated its disapproval of the Court of Claims' fair use holding.'').

order to "codify the common-law doctrine." *Harper & Row*, 471 U.S. at 549. Accordingly, the Court of Claims decision in *Williams & Wilkins* remains binding precedent in the Federal Circuit, where infringement claims against the federal government must be brought.[13]

The continued vitality of *Williams & Wilkins* in the Federal Circuit does not, however, mean that all federal government photocopying is a fair use. The *Williams & Wilkins* court, after discussing at length the eight different considerations, or "elements," that contributed to its decision, 487 F.2d at 1353–62, emphasized that its holding (that the library copying practices at issue were noninfringing)

This is incorrect, because section 108 of the 1976 Act does not narrow the protection for fair use provided by the common-law doctrine codified in section 107 Section 108(a) of the Act, 17 U.S.C A § 108(a) (West 1996 & Supp 1999), provides that, under certain conditions, it is "not an infringement of copyright for a library or archives . to reproduce no more than one copy or phonorecord of a work, or to distribute such copy or phonorecord," "[n]otwithstanding the provisions of section 106." Section 108(g)(2), in turn, states that "[t]he rights of reproduction and distribution *under this section* . . . do not extend" to certain cases involving the "systematic reproduction or distribution of single or multiple copies." (Emphasis added) Section 108(g)(2) does not "expressly proscribe[ ]" the copying practices at issue in *Williams & Wilkins*—indeed, nothing in section 108 "proscribes" any practice at all. Nor is there anything in section 108 suggesting that "systematic" reproduction is "lawful only via the [section 108(g)(2)] proviso, [and] could not be a fair use " United States Copyright Office, *Report of the Register of Copyrights· Library Reproduction of Copyrighted Works* (17 U.S.C. 108), at 98 (1983) ("1983 Register Report") At most, section 108(g)(2) merely provides that the "rights" to copy and distribute that are provided "under" section 108 "do not extend to" the "systematic" practices described in section 108(g)(2) To be sure, "section 108 authorizes certain photocopying practices which *may not* qualify as a fair use," House Report at 74 (emphasis added), *reprinted in* 1976 U.S C.C.A N. at 5688, *see also* Senate Report at 67 However, the statute does not provide, or even suggest, that the circumstances under which copying is noninfringing under section 108(a) are those "that would *typically not* amount to fair use [under section 107]," White Paper at 84–85 (emphasis added), nor that "Section 108 was enacted to make lawful some types of copying which *would* otherwise be infringements of copyright, fair use notwithstanding," 1983 Register Report at 96 (emphasis added) Indeed, by its express terms, nothing in section 108 "in any way affects the right of fair use as provided by section 107." 17 U.S.C § 108(f)(4) (1994); *see also* House Report at 74 ("No provision of section 108 is intended to take away any rights existing under the fair use doctrine."), *reprinted in* 1976 U.S C C.A N at 5687–88, Senate Report at 67 (same); 122 Cong. Rec. 3836 (1976) (statement of Sen Magnuson) ("the Judiciary Committee clearly set out in their report      that the fair use doctrine not only applies to reproduction practices of libraries, but that in no way did they intend section 108 to be a limitation upon the fair use doctrine").

Accordingly, that section 108 renders certain copying practices "not an infringement" does not affect whether such practices are noninfringing fair uses under section 107 *See Texaco*, 802 F. Supp. at 28 & n 26 (emphasizing that "Section 108 is a separate special statutory exemption governed by an entirely different set of standards [than under section 107]," and rejecting the argument "that the understanding of Section 107 should be influenced by what is permitted under Section 108"); *accord* 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05[E][2], at 13–240 (1998) A certain copying practice can be "noninfringing" under section 107, under section 108, under both provisions, or under neither. In its 1983 Report, the Register of Copyrights suggested that such a construction of the statute, in which practices permissible under section 108 might also be permissible under section 107, would "render § 108 superfluous." 1983 Register Report at 96 n.4 That is not the case, however. As the Register noted, "the library community sought § 108 to permit copying that had not been *spelled out* in the proposed fair use provision " *Id.* (emphasis added). Section 108 identifies ("spell[s] out") as noninfringing a category of library photocopying that may, or may not, constitute fair use Section 108 thus fairly can be viewed as a very valuable — and not superfluous — safe harbor: If a certain library practice is noninfringing under the specific and detailed provisions of section 108(a) (as confined by section 108(g)(2)), a library need not be concerned about how that particular photocopying practice would fare under section 107's more complex and indeterminate fair use standards.

[13] Section 1498(b) of title 28 provides that "the exclusive action which may be brought for infringement [by the federal government] shall be an action by the copyright owner against the United States in the Court of Federal Claims " 28 U.S.C § 1498(b) (Supp. III 1997). Decisions of that court are appealable to the United States Court of Appeals for the Federal Circuit, *see* 28 U S C § 1295(a)(3) (1994), which in turn considers itself bound by decisions (such as *Williams & Wilkins*) that the former Court of Claims issued prior to October 1982. *See South Corp v. United States*, 690 F 2d 1368, 1370 & n.2 (Fed Cir 1982); *see also, e.g., Gargoyles, Inc. v. United States*, 113 F 3d 1572, 1576 (Fed Cir 1997).

was based upon all of the elements present in that case, and that its decision would not necessarily resolve different cases "with other significant variables," *id.* at 1362. The court expressly noted that it was not determining whether any of the particular elements in the *Williams & Wilkins* case would be sufficient for a finding of fair use, nor whether all of the relevant elements cumulatively were "essential" to the finding of fair use: It sufficed for the court simply to decide that "at least when all co-exist in combination a 'fair use' is made out." *Id.*; *see also id.* ("we feel a strong need to obey the canon of judicial parsimony, being stingy rather than expansive in the reach of our holding").[14] Implicitly, then, the decision in *Williams & Wilkins* itself suggests that there may be some circumstances under which government photocopying might be infringing. *See also* Brief for the United States at 14, *Williams. & Wilkins Co. v. United States*, 420 U.S. 376 (1975) (No. 73–1279) ("The doctrine is applied as its rationale dictates in each case, and has no sharp edges.").[15]

A "per se" rule also would be inconsistent with the approach that the Supreme Court subsequently has taken in its decisions involving section 107 of the Copyright Act. The Court repeatedly has emphasized that the task of determining whether a particular use is fair "is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis." *Campbell*, 510 U.S. at 577; *accord id.* at 584 (Congress " 'eschewed a rigid, bright-line approach to fair use,'" in favor of "a 'sensitive balancing of interests.'") (quoting *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 449 n.31, 455 n.40 (1984)); *Harper & Row*, 471 U.S. at 552 ("fair use analysis must always be tailored to the individual case").

### III. *Determining Whether a Particular Government Photocopying Practice is a Fair Use*

Our conclusion that government photocopying is not invariably noninfringing does not, of course, answer the question whether government agencies should enter into licensing agreements for photocopying, and if so, what the terms and

---

[14] More recent fair use decisions involving photocopying similarly have been confined narrowly to the particular copying practices in dispute *See, e g , Texaco*, 60 F.3d at 931 ("Our ruling is confined to the institutional, systematic, archival multiplication of copies revealed by the record — the precise copying that the parties stipulated should be the basis for . . . decision . ")

[15] As we discuss *supra* p. 88, we have no reason to believe that any agency of the executive branch has argued, or advised, that government copying is "per se a fair use." In this respect, it is notable in particular that, in its Supreme Court brief in *Williams & Wilkins*, the United States cited a House Report as "indicat[ing] . that photocopying by the government may in some circumstances constitute copyright infringement " Brief for the United States at 15 n 24, *Williams & Wilkins Co. v. United States*, 420 U.S. 376 (1975) (No 73–1279) (citing H.R. Rep. No 86–624, at 5 (1959)) In the cited House Report, a House Committee indicated that the federal government could infringe a copyright when it "publishes" an article without permission *See supra* note 6. The Committee did not indicate what it meant by "publishes," and did not expressly mention photocopying At the page of the House Report (page 5) that the Solicitor General cited, however, a letter written by the Department of Commerce assumes that government *photocopying* could be infringing. *See also id.* at 8 (reflecting a similar assumption conveyed by the Librarian of Congress) There is no suggestion in the House Report that the House Committee disagreed with this assumption.

conditions of such agreements should be. In answering that question, there is an inescapable tension. On the one hand, because of the highly fact-bound nature of the fair use inquiry, it is difficult to ascertain in advance which governmental practices will, or will not, be fair uses: There is an "endless variety of situations and combinations of circumstances that can rise in particular cases." House Report at 66, *reprinted in* 1976 U.S.C.C.A.N. at 5680. Such uncertainty, when viewed in isolation, might weigh in favor of entering into relatively broad licensing agreements, so as to ensure that an agency's photocopying will never be infringing. On the other hand, and in addition to the desire to avoid unnecessary costs, there is an important legal consideration that counsels against entering into unnecessary licensing agreements and in favor of limiting such agreements to encompass only those photocopying practices that are infringing — namely, the concern that general custom and usage may be integral to the fair use analysis.[16] Indeed, at least one court has opined, in particular, that whether it is "fair," under the copyright law, to engage in a photocopying practice without compensation may depend, in part, on whether similarly situated entities customarily agree to pay a fee to the copyright holders.[17] We have no occasion here to consider whether that court was correct in this regard; but it is possible that other courts may follow suit. Accordingly, if government agencies routinely agree to pay licensing fees to engage in photocopying practices that were fair uses at the time, there is a chance some courts may conclude that a growing or longstanding custom of paying such fees weighs against a finding that such photocopying practices are fair uses when unlicensed. Thus, an agency that decides to negotiate a photocopying license should seek to limit the scope of the licensing agreement so as not to cover those photocopying practices that the agency, in good faith, concludes are not infringing.

In the end, each agency must do its best to evaluate whether any of its photocopying practices are infringing, and, if so, to obtain proper authorization for such uses of copyrighted materials. Although, as we have explained, there may be many government photocopying practices that are fair uses (or that are, for other reasons, not infringing), under some circumstances government photocopying may not be a fair use. In evaluating whether their practices are infringing, agencies should be guided by *Williams & Wilkins*, which, as noted above, is still binding precedent in the Federal Circuit. However, as explained above, the holding in *Williams & Wilkins* itself was dependent on the particular facts of that case, and the 8150 calculus may be different with respect to govern-

---

[16] *See, e.g., Williams & Wilkins,* 487 F.2d at 1355-56, *see also Harper & Row,* 471 U.S. at 550 (the fair use doctrine traditionally "was predicated on the author's implied consent to 'reasonable and customary' use when he released his work for public consumption")

[17] *See Princeton Univ. Press,* 99 F.3d at 1387 (consideration of the potential licensing revenues for photocopying in a fair use analysis is "especially" appropriate where the copyright holder not only has an interest in exploiting the licensing market, but also "has actually succeeded in doing so") *But cf. Campbell,* 510 U.S. at 585 n.18 (defendants' request for permission to use copyrighted song in a parody does "not necessarily suggest that they believed their version was not fair use; the offer may simply have been made in a good-faith effort to avoid this litigation").

ment photocopying practices that diverge in material ways from the NIH and NLM practices at issue in *Williams & Wilkins*.[18]

Moreover, agencies should be aware that, in two important recent cases in other circuits, sharply divided courts of appeals have held that certain commercial photocopying practices were not fair uses. In *Princeton Univ. Press v. Michigan Document Servs., Inc.*, 99 F.3d 1381 (6th Cir. 1996) (en banc), *cert. denied*, 520 U.S. 1156 (1997), the United States Court of Appeals for the Sixth Circuit held that a commercial copyshop had engaged in willful infringement by reproducing substantial segments of copyrighted works of scholarship and binding such reproductions into coursepacks that the copyshop then sold to students. In *American Geophysical Union v. Texaco, Inc.*, 60 F.3d 913 (2d Cir. 1994), *cert. dismissed*, 516 U.S. 1005 (1995), the United States Court of Appeals for the Second Circuit held that Texaco's systematic photocopying of scientific journal articles for its researchers' archival use was infringing. Even if the United States Court of Appeals for the Federal Circuit were to adopt the reasoning of these decisions, the rationale of those decisions would not apply with full force in the context of government photocopying, since the decisions each rested, in part, on the fact that each of the defendants "acquire[d] conspicuous financial rewards from its use of the copyrighted material." *Id.* at 922; *see also Princeton Univ. Press*, 99 F.3d at 1386, 1389. Moreover, as the *Texaco* court noted, "courts are more willing to find a secondary use [i.e., the use that is made of the photocopies] fair when it produces a value that benefits the broader public interest." 60 F.3d at 922. Nevertheless, the ongoing debate among the judges in cases such as these (and in *Williams & Wilkins*) demonstrates that the boundaries of fair use in the photocopying context are uncertain, highly contested, and especially dependent upon the particulars of a given case. And, while in some cases it might be fairly easy for an agency to determine that a government practice is noninfringing,[19] usually that will not be the case: Whether a particular government photocopying practice is a fair use often will depend upon a " 'sensitive balancing of

---

[18] Moreover, the subsequent advent of the CCC, and the possibility of reasonable licensing agreements with that organization, may affect at least one of the factors that led the Court of Claims to rule against the copyright holder in *Williams & Wilkins*. The Court of Claims reasoned that medical science would be seriously hurt by a finding that the NIH and NLM photocopying was infringing, since the result of such a holding could have been that libraries would have to cease their photocopying practices. *See* 487 F.2d at 1356–57. But insofar as such libraries now could avoid a finding of fair use by agreeing to pay a reasonable and affordable licensing fee — that is, a fee that would not materially deter the actual making and use of valuable photocopies — the harm that the *Williams & Wilkins* court foresaw could be diminished *See Texaco*, 60 F.3d at 924 ("To the extent the copying practice was 'reasonable' in 1973 [when *Williams & Wilkins* was decided], it has ceased to be 'reasonable' as the reasons that justified it before [photocopying licensing] have ceased to exist ') (quoting the district court opinion, 802 F. Supp. at 25) *But see id* at 934 (Jacobs, J , dissenting).

[19] For an example outside the context of photocopying, *see, e.g.*, House Report at 73 ("The Committee has considered the question of publication, in Congressional hearings and documents, of copyrighted material. Where the length of the work or excerpt published and the number of copies authorized are reasonable under the circumstances, and the work itself is directly relevant to a matter of legitimate legislative concern, the Committee believes that the publication would constitute fair use."), *reprinted in* 1976 U.S C.C A.N at 5687

interests.' " *Campbell*, 510 U.S. at 584 (quoting *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 455 n.40 (1984)).

In the text of section 107 of the Copyright Act itself, Congress has instructed that, in determining whether the use made of a work in any particular case is a fair use, "the factors to be considered shall include" the following:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

> (2) the nature of the copyrighted work;

> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

> (4) the effect of the use upon the potential market for or value of the copyrighted work.

These four statutory factors should not be treated in isolation, one from another. *Campbell*, 510 U.S. at 578. Nor are those factors exhaustive. *See Harper & Row*, 471 U.S. at 560; H.R. Rep. No. 102–836, at 9–10 (1992), *reprinted in* 1992 U.S.C.C.A.N. 2553, 2561–62.[20] Most importantly, it is critical that the statutory factors, as well as all other pertinent factors and considerations, "be explored, and the results weighed together, *in light of the purposes of copyright.*" *Campbell*, 510 U.S. at 578 (emphasis added); *see also id.* at 581 (the fair use inquiry requires that any particular use of copyrighted material "be judged, case by case, in light of the ends of the copyright law").[21] Accordingly, before turning to particular factors and considerations that agencies should consider in the context of government photocopying, it is important once again to identify the "purposes of copyright."

Copyright law "ultimately serves the purpose of enriching the general public through access to creative works." *Fogerty v. Fantasy, Inc.*, 510 U.S. 517–18, 527 (1994); *see also Harper & Row*, 471 U.S. at 545 ("copyright is intended to increase and not to impede the harvest of knowledge"). Thus, in determining whether a particular photocopying practice is a fair use, the ultimate question to be answered is whether permitting the government to continue to engage in the practice without paying a licensing fee would "serve[ ] the copyright objective

---

[20] Section 107 expressly provides that "the factors to be considered *shall include*" the four enumerated factors (emphasis added), and the 1976 Act elsewhere provides that the term "including" is "illustrative and not limitative," 17 U S.C. § 101 (1994)

[21] *See also* 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13 05[A][5], at 13–195 (1998) ("the protean factors enumerated in Section 107, standing by themselves, lack the concreteness to provide definite answers to difficult cases"); Lloyd L Weinreb, *Fair Use*, 67 Fordham L. Rev 1291, 1306 (1999) ("fair use depends on a calculus of incommensurables").

of stimulating productive thought and public instruction without excessively diminishing the incentives for creativity." Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1110 (1990), *cited with approval in Campbell*, 510 U.S. at 578.[22]

Moreover, although the point is less clearly established, the fair use doctrine may be understood to contemplate permitting uses that serve "not only . . . the purpose of copyright but also . . . other socially recognized purposes." Lloyd L. Weinreb, *Fair's Fair: A Comment on the Fair Use Doctrine*, 103 Harv. L. Rev. 1137, 1144 (1990). For example, the Supreme Court in the *Sony* case held that consumer videotaping of television broadcasts for purposes of "time-shifting" was a fair use, in part because such a practice "yields societal benefits." 464 U.S. at 454. Elaborating on this point, the Court cited the example of using a videotaping machine "to enable a [hospital] patient to see programs he would otherwise miss," which, as the Court explained, "has no productive purpose other than contributing to the psychological well-being of the patient." *Id.* at 455 n.40. Of greater pertinence to the subject matter at hand — namely, government copying — the Court further suggested that "a legislator who copies for the sake of broadening her understanding of what her constituents are watching; or a constituent who copies a news program to help make a decision on how to vote," are examples of uses that could be "fair." *Id.*

Thus, it fairly can be argued that, as a general matter, "courts are more willing to find a secondary use fair when it produces a value that benefits the broader public interest," *Texaco*, 60 F.3d at 922, in contrast with a use that "can fairly be characterized as a form of 'commercial exploitation,' i.e., when the copier directly and exclusively acquires conspicuous financial rewards from its use of the copyrighted material," *id.*[23] For instance, the federal government typically photocopies materials in order to facilitate some other, "secondary" use of such materials, and such secondary use generally is aimed at providing a public benefit, or at serving a "broad[ ] public purpose." *Id.* Insofar as an agency's photocopying is intended to facilitate such public purposes, that should weigh in favor of a finding of fair use.[24] *See also infra* p. 101 (discussing whether purpose of the photocopying is to enhance profitmaking).

---

[22] *See also, e.g., Atari Games Corp. v Nintendo of Am., Inc.*, 975 F 2d 832, 843 (Fed. Cir 1992) (where, in "reverse engineering" of computer software, "intermediate" copying permitted the user to study that software and thereafter design new video game programs, the resultant "growth in creative expression" weighed in favor of finding that the copying was a fair use).

[23] *See also, e g., Nimmer*, § 13.05[B][4], at 13–205 ("The public interest is also a factor that continually informs the fair use analysis ") (footnote omitted).

[24] *See, e.g., Williams & Wilkins*, 487 F 2d at 1353 ("We cannot believe, for instance, that a judge who makes and gives to a colleague a photocopy of a law review article, in one of the smaller or less available journals, which bears directly on a problem both judges are then considering in a case before them is infringing the copyright, rather than making 'fair use' of his issue of that journal."), *Key Maps, Inc*, 470 F. Supp at 38 (county fire marshal's distribution of copies of copyrighted maps to 50 fire departments, law enforcement agencies, and civil defense units in the county was "legitimate, fair, and reasonable," since the copies were disseminated "solely for internal purposes which related to a discernable public interest," namely, "the coordination of fire prevention activities in the unincorporated areas of [the] county"), *see also* House Report at 65 (noting that, under section 107 of the 1976 Act,

In order to decide whether a particular government use of copyrighted materials would, on the whole, "promote the Progress of Science and useful Arts," it is necessary to take into account an "ample view of the universe of relevant evidence." *Campbell*, 510 U.S. at 575, 584. Similarly, in order to determine whether any other benefits to the broader public interest would sufficiently outweigh the costs of any reduction in the incentives for creativity, it is necessary to engage in a comprehensive evaluation of all pertinent factors. We think that, in the particular context of government photocopying, the following specific considerations (each of which bears on the four enumerated statutory factors) might have a significant impact on the fair use calculus:

(a) One important consideration that courts typically address under the first statutory factor ("the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes") is whether the use in question is undertaken in order to increase the user's profits. In most, if not all, cases, the purposes for which the government makes photocopies do not include profitmaking or commercial exploitation. Although the nonprofit nature of the government's use of photocopies would not be dispositive, *see Campbell*, 510 U.S. at 584, it certainly would be "one element," *id.*, germane to the fair use question.[25] The commercial/nonprofit distinction may be especially significant where, as in most cases of photocopying, the secondary use is not "transformative" — i.e., where the copyrighted material is merely copied in its original form and is not transformed into another valuable product. *See id.* at 579 (the more transformative the use, the less significant to the analysis will be the question of commercialism).[26]

---

"courts might regard as fair" the "reproduction of a [copyrighted] work in legislative or judicial proceedings or reports"), *reprinted in* 1976 U.S C.C.A N. at 5678–79; Senate Report at 61–62 (same), *Harper & Row*, 471 U.S. at 584–85 n.8 (Brennan, J., dissenting) (example of a judicial opinion quoting extensively from copyrighted materials), *Sinai*, 1992 WL 470699, at *3 (state Bureau of Automotive Repairs used materials for a "public purpose" when it disseminated an auto emissions chart to field offices throughout the state so that those offices could assist smog check stations and consumers in complying with the state's emission laws).

[25] *See also Harper & Row*, 471 U.S at 562, *Texaco*, 60 F 3d at 921–22

[26] Counsel for the CCC, citing *Campbell*, suggest that nontransformative uses "are unlikely to be regarded as fair ones." Weil, Gotshal Memo at 8 However, the Court in *Campbell* simply indicated that, because "the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works, . . . [s]uch works thus lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright, . . . and the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use " 510 U.S. at 579. The Court expressly cautioned that such transformative use "is not absolutely necessary for a finding of fair use," *id.*, and in support of that proposition, the Court cited (i) a case (*Sony Corp of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984)) in which the Court found a nontransformative use to be noninfringing, and (ii) the express indication in section 107 of the 1976 Act that reproduction of multiple copies for classroom distribution can be a fair use. *Id* at 579 & n.11, *see also id.* at 584–85 (eschewing fair use analysis that relies on a "hard evidentiary presumption," in light of the need for a "sensitive balancing" of interests). It is important to note, as well, that the very first example that section 107 provides of a use that can be "fair" is "reproduction in copies or phonorecords," even though such "reproduction" in most cases would not be "transformative" in the sense the Court described in *Campbell See also* House Report at 66 ("the reference [in 17 U.S C. § 107] to fair use 'by reproduction in copies or phonorecords or by any other means' is mainly intended to make clear that the doctrine has as much application to photocopying and taping as to older forms of use"), *reprinted in* 1976 U.S C C A.N. at 5679.

(b) Photocopying more likely will be deemed "fair" where the photocopies are disseminated to a discrete and limited audience within the government. To the extent that copies are sold, or distributed broadly, especially outside the government, that likely would weigh against a finding of fair use. *See Williams & Wilkins*, 487 F.2d at 1353 & n.12, 1354–55. (This consideration likely would be germane to the first ("purpose and character of the use") and fourth ("effect of the use upon the potential market for or value of the copyrighted work") statutory factors.)

(c) Copying that is done "spontaneous[ly]," for the purpose of facilitating an immediate and discrete objective, is more likely to be a fair use than systematic "archival" copying of extensive materials for possible future use. *See Texaco*, 60 F.3d at 919–20. (This consideration, too, would bear on the first and fourth statutory factors.) And, as the third statutory factor expressly indicates, "the amount and substantiality of the portion used in relation to the copyrighted work as a whole" also is relevant to determining whether a use is fair.

(d) Copying materials for the purpose of collecting or studying certain facts or ideas contained therein — as opposed to the work's original expression — increases the likelihood that the reproduction will be a fair use. In *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991), the Court emphasized that, as a matter of constitutional law, "facts are not copyrightable." *Id.* at 344. All facts — scientific, historical, biographical, and news of the day — " 'may not be copyrighted and are part of the public domain available to every person.' " *Id.* at 348 (citation omitted); *accord Harper & Row*, 471 U.S. at 556 ("No author may copyright his ideas or the facts he narrates."). Furthermore, 17 U.S.C. § 102(b) (1994) provides that "[i]n no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery." The exclusion of facts and ideas from copyright protection, like the fair use doctrine, serves the goal of promoting the progress of science and useful arts. *See Campbell*, 510 U.S. at 575 n.5.[27] Accordingly, copyright protection for a work containing facts or ideas "is limited to those aspects of the work — termed 'expression' — that display the stamp of the author's originality." *Harper & Row*, 471 U.S. at 547. Indeed, as the Court reemphasized in *Campbell*, " 'facts contained in existing works may be freely copied.' " 510 U.S. at 575 n.5 (quoting *Feist*, 499 U.S. at 359).[28] Thus, where the government's copying is limited to the bare facts contained in particular mate-

---

[27] Moreover, the Copyright Act's distinction between copyrightable expression and uncopyrightable facts and ideas is necessary in order to reconcile the restrictions of the Act with the First Amendment. *See Harper & Row*, 471 U.S. at 556, 560, *see also New York Times Co. v. United States*, 403 U.S. 713, 726 n.* (1971) (Brennan, J., concurring), *cited with approval in Harper & Row*, 471 U.S. at 556

[28] Thus, for example, the Court in *Harper & Row* implied that although direct quotations from President Ford's biography were subject to copyright protection, the historical facts contained in that biography were not entitled to such protection and could be freely copied. *See* 471 U.S at 565–66 & n.8 (applying copyright analysis only to "verbatim quotes" from the biography, and excluding from infringement consideration historical quotations attributed to third parties and to government documents)

rials, and there is no copying of protected expression, there is no possibility of copyright infringement, and the fair-use question is inapposite.

Moreover, even if a document or book is entitled to some copyright protection, nevertheless, as a general matter "fair use is more likely to be found in factual works than in fictional works." *Stewart v. Abend*, 495 U.S. 207, 237 (1990). Accordingly, even where the government copies materials that contain protected "expression," or factual compilations that arrange or select facts in a manner sufficiently original to trigger some limited, "thin" copyright protection,[29] the photocopying more likely will be a fair use if the purpose of the copying is simply to obtain, collect, or study the facts and ideas contained in the materials. This will be the case especially where, for purposes of photocopying, the facts and ideas cannot readily be segregated from the protected expression, and where the government's copying of the protected expression therefore is merely incidental to its copying of unprotected facts and ideas.[30]

(e) The fourth factor that the statute expressly identifies as relevant to the fair-use analysis is the "effect of the use upon the potential market for or value of the copyrighted work." This factor requires courts "to consider not only the extent of the market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original." *Campbell*, 510 U.S. at 590 (quoting 3 *Nimmer* § 13.05[A][4], at 13–102.61 (1993)). The importance of this factor "will vary, not only with the amount of harm, but also with the relative strength of the showing on the other [fair-use] factors." *Id.* at 590 n.21.

---

[29] "[T]he copyright in a factual compilation is thin," extending only to the selection or arrangement of the facts, if any, that is original or expressive *Feist*, 499 U S at 348 As the Court explained·

> The mere fact that a work is copyrighted does not mean that every element of the work may be protected Originality remains the *sine qua non* of copyright, accordingly, copyright protection may extend only to those components of a work that are original to the author. . . Thus, if the compilation author clothes facts with an original collocation of words, he or she may be able to claim a copyright in this written expression. Others may copy the underlying facts from the publication, but not the precise words used to present them.

*Id* at 348–49

[30] *See, e g., Texaco*, 60 F 3d at 925 & n.11, *National Rifle Ass'n of Am v Handgun Control Fed. of Ohio*, 15 F 3d 559, 562 (6th Cir.), *cert. denied*, 513 U.S 815 (1994), *Texaco*, 802 F Supp at 15 (although such a fact-centered justification for photocopying "has some merit," and is "ingenious," it "simply does not fit the facts of the case"); *see also, e g, Atari Games Corp*, 975 F 2d at 843 ("When the nature of a work requires intermediate copying to understand the ideas and processes in a copyrighted work, that nature supports a fair use for intermediate copying Thus, reverse engineering object code to discern the unprotectable ideas in a computer program is a fair use"); *Sega Enters. Ltd. v. Accolade, Inc*, 977 F.2d 1510, 1524–26 (9th Cir. 1992). By analogy, in the context of publication (rather than mere reproduction) of copyrighted materials, the Supreme Court has indicated that it may be permissible to copy protected expression verbatim where "necessary adequately to convey the facts," or where particular expression is "so integral to the idea expressed as to be inseparable from it" *Harper & Row*, 471 U S at 563, *see also* Leval, *Toward a Fair Use Standard*, 103 Harv L Rev. at 1113–15. Perhaps the most famous case of this sort is *Time Inc v Bernard Geis Assocs*, 293 F. Supp. 130 (S D N Y 1968), in which the court held that it was fair use to depict frames from the copyrighted Zapruder film in a book about the Kennedy assassination, where there was "a public interest in having the fullest information available on the murder of President Kennedy," and where such photographs made the author's theory of the assassination "easier to understand," *id* at 146.

The most obvious way in which copying can have an adverse market effect is where it directly curtails demand for purchase of the original work, such as where an entity uses photocopying in lieu of additional subscriptions of the original work that it otherwise would purchase. *See, e.g., Texaco*, 60 F.3d at 927–29. Furthermore, with the advent of the CCC, it now can be argued that the failure to pay a licensing fee for the photocopying of materials covered by the CCC has an adverse effect on another potential "market" that was not present at the time of *Williams & Wilkins* — namely, the potential "licensing fee" market. *See, e.g., Princeton Univ. Press*, 99 F.3d at 1387–88; *Texaco*, 60 F.3d at 929–31. Because this sort of "harm" to a licensing fee "market" could, by definition, exist whenever an entity refuses to provide the requested compensation for its copies, what is significant is not the simple question of whether any such market harm exists, but rather, the magnitude and effect of the harm. "Market harm is a matter of degree." *Campbell*, 510 U.S. at 590 n.21.[31] Harm to this potential "licensing fee" market, like other forms of market harm, should be germane to the fair-use analysis only if, and to the extent that, such harm would deter " 'the creation and publication of edifying matter.' " *Id.* at 578 n.10 (quoting Leval, *Toward a Fair Use*, 103 Harv. L. Rev. at 1134). If "unrestricted and widespread [photocopying] of the sort engaged in by the [government]," *Campbell*, 510 U.S. at 590 (internal quotation marks omitted) would not appreciably alter the incentives to create and disseminate the underlying works (and other "edifying" original creations), the harm to the fee "market" should have correspondingly limited impact when evaluating this fair use factor.

## Conclusion

There is no "per se" rule that government reproduction of copyrighted material — including, in particular, government photocopying of copyrighted materials for internal government use — automatically qualifies as a fair use under section 107 of the Copyright Act of 1976. However, government photocopying would in many contexts be noninfringing because it would be a "fair use"; and there are good reasons that, if an agency decides to negotiate photocopying licensing agreements, it should seek to limit the scope of any such arrangement to cover only those government photocopying practices that otherwise would, in fact, be infringing.

RANDOLPH D. MOSS
*Acting Assistant Attorney General*
*Office of Legal Counsel*

---

[31] *See also* William W Fisher III, *Reconstructing the Fair Use Doctrine*, 101 Harv L. Rev 1659, 1671–72 (1988).